**UNITED STATES of America ex rel. Dean HANCOCK, Plaintiff,**

v.

**Frank J. PATE, Warden, Illinois State Penitentiary, Joliet, Illinois, Defendant.**

**No. 63 C 1205.**

United States District Court
N. D. Illinois, E. D.

Nov. 7, 1963.

Dean Hancock, pro se.

William G. Clark, Atty. Gen. of Illinois, Chicago, Ill., for defendant.

WILL, District Judge.

This is another in the never-ending flow of cases initiated by state-incarcerated prisoners alleging an abridgment of their federal civil rights by state prison officials and filed pursuant to the Civil Rights Act, 42 U.S.C. §§ 1981–94.

In what has become an almost predictable response to complaints of this nature, defendant Pate, Warden of the Illinois State Penitentiary at Joliet, moves to dismiss the action on the theory that the power to control or regulate the internal administration, management and discipline of prisons operated by the states is vested solely in the states and not subject to intervention by the federal courts.

■ Dean Hancock, petitioner *pro se* herein, filed a complaint, in the form of a letter to Chief Judge Campbell of this Court, alleging in effect that certain acts of defendant Pate and his agents constituted cruel and unusual punishment in violation of the Eighth Amendment to the federal Constitution. Following defendant's motion to dismiss, petitioner reiterated his claims in a further communication with this Court wherein he also asked for a declaratory judgment and for injunctive relief. From the statements made in the above described documents, each drawn by the petitioner without benefit of counsel and therefore to be given a broad interpretation, the Court approaches the action as having been brought under § 1983 of Title 42, U.S.C., which makes liable any person who, under color of state law, causes another person under the jurisdiction of the United States to be deprived of any rights, privileges or immunities secured by the federal Constitution.

■ Hancock states, and for the purpose of deciding a motion to dismiss I am required to take all of plaintiff's allegations as true, that the incident giving rise to this action was an altercation between him and a fellow prisoner, Radis. Plaintiff alleges further that, for at least one week prior to their fight, Radis had been threatening various inmates at the Vocational School of the penitentiary where both men were assigned. Certain of defendant's agents, he asserts, were aware of these threats and warned Radis about them. These admonitions were disregarded by Radis, who attacked petitioner at the latter's work station. Petitioner defended himself with a scrap steel rod about two feet in length, the same size as the weapon, a piece of iron pipe, Radis used in the assault.

As a result of this fracas, petitioner was given fifteen days in solitary confinement. Upon a release from solitary he was reclassified from Class A to Class E, this status being marked by giving the prisoner a "Blue Shingle", the symbol of an incorrigible offender. The prisoner so designated is singled out by having his name and number painted in white on a blue board which replaces

the standard white board with black lettering over his cell and which identifies the other inmates. Other results of Class E rating are denial of attendance at recreational events, limitation of purchases at the prison store and, most important to the question here posed, ineligibility for parole for a period following the reclassification.

Hancock was sentenced to a term of two to ten years on December 21, 1961. He was to have a hearing before the Pardon and Parole Board prior to December, 1963, the conclusion of his minimum term. The Class E status here operates to bar his appearance before the above-mentioned Board until July, 1965. It is the crux of Hancock's petition, then, that to be deprived of eligibility for parole for a year and a half as a result of having defended himself against unprovoked attack is imposition of cruel and unusual punishment in violation of the Eighth Amendment to the federal Constitution as applied to the states through the Fourteenth Amendment.[1]

Defendant's motion to dismiss relies on Siegel v. Ragen, 180 F.2d 785 (7th Cir.), cert. denied, 339 U.S. 990, 70 S. Ct. 1015, 94 L.Ed. 1391 (1950), the opinion most commonly cited as authority for the proposition that federal courts have no power to control or regulate the internal discipline of the penal institutions of the various states. The broad principle enunciated in Siegel offers an easy route for the disposition of actions instituted by inmates of state prisons. In light of the facts here presented—and the now discredited doctrines upon which some of the reasoning in the Siegel decision rests—I am loathe to accept defendant's representations that the case be summarily dismissed.

■ The discussion in Siegel sustaining the "internal discipline" doctrine is based in great measure on the failure of the petitioner in that case to exhaust his state remedies. The Supreme Court decision in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), disposed of the theory that a plaintiff suing under the Civil Rights Act must first avail himself of state remedies: " * * * The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." Id., 365 U.S. at 183, 81 S.Ct. at 482, 5 L.Ed.2d 492.

The state remedies discussion in Siegel, which is in the nature of dictum, incorporates the notion that a prisoner's incarceration results in a complete loss of his civil rights except protection of his life, liberty and property. The Seventh Circuit has moderated its view in this regard as witnessed by its decision in Coleman v. Johnston, 247 F.2d 273 (7th Cir. 1957). See also this Court's opinion in Redding v. Pate, 220 F.Supp. 124, 128 (N.D.Ill.1963).

■ A more limited recital of restrictions upon the rights of inmates is found in the second case relied upon by the defendant, United States ex rel. Wagner v. Ragen, 213 F.2d 294 (7th Cir.), cert. denied, 358 U.S. 846, 75 S.Ct. 68, 99 L. Ed. 667 (1954). Although also citing Siegel as authority for the "internal discipline" doctrine, greater emphasis is placed upon cases which relate solely to restraints upon prisoners during their incarceration.[2] These would suffice as

---

1. In the past, Courts have spurned the "cruel and unusual punishment" argument when offered by state-incarcerated prisoners on the theory that the Eighth Amendment did not apply to the states. The case of Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1963), has reversed this doctrine.

2. Price v. Johnston, 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948) (prisoner's right to plead and manage his own

cause); United States ex rel. Morris v. Radio Station WENR, 209 F.2d 105 (7th Cir. 1953) (claims by Negro prisoners that they were being denied equal protection of the laws by virtue of their not being permitted to participate in radio programs transcribed at the prison); Morris v. Igoe, 209 F.2d 108 (7th Cir. 1953) (censorship of newspapers subscribed to by a prisoner); Adams v. Ellis, 197 F.2d 483 (5th Cir. 1952) (censorship of mail); Stroud v. Swope,

authority to sustain defendant's motion to dismiss were the case limited to the petitioner's challenge of the Warden's discretionary authority to place inmates in solitary confinement, to use the "Blue Shingle" emblem, to deny attendance at recreational events and to limit purchases at the prison store. I agree that "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights * * *", Price v. Johnston, note 2 supra, 334 U.S. at 285, 68 S.Ct. at 1060, 92 L.Ed. 1356, and recognize the need for flexibility in dealing with situations which confront prison administrators.

█ It is the added penalty of postponement of eligibility for parole, when viewed in the light of the allegations made here, that distinguishes this case from those where the "internal discipline" doctrine applies. Defendant's decision to put upon plaintiff the onus of the "Blue Shingle" goes further than mere regulation of internal discipline as interpreted by the cases cited in Wagner, supra. Warden Pate's decision is not limited to curtailing plaintiff's rights in prison; it goes to the more basic question of how long he is to be deprived of his liberty. True, plaintiff has no unqualified right to be free. His right to be heard with regard to parole, however, is as much a part of his sentence as is the terminal date set by the judge. The Pardon and Parole Board may deny the request for parole on the basis of

information which it feels pertinent to the question of the prisoner's ability to maintain a lawful existence in society.[3] That decision is within the province of the Board. To me, defendant and his agents over-reach their authority—limited as it is to the supervision of prisoners while in state custody—when they bar or postpone the consideration of parole in normal course, a decision which trespasses upon the power granted to another agency of the state, the Pardon and Parole Board.

█ There are, then, two separate constitutional questions raised by plaintiff's complaint. First, does the warden have as a sanction against prison rule violators the power to withhold or defer eligibility for parole or is he, when using this power, depriving the plaintiff of his liberty without due process of law in violation of the Fourteenth Amendment? Secondly, if the use of this power is found to be constitutional and this action limited to the facts at bar, is the use of the sanction against a prisoner who acted in self defense, to borrow language from Mr. Justice Douglas, a punishment out of all proportion to the offense so as to bring it within the ban against cruel and unusual punishment?[4] I conclude that the facts alleged herein raise constitutional issues sufficient to bring the case within the jurisdiction conferred upon this Court by the Civil Rights Act. The motion to dismiss is therefore denied.

187 F.2d 850 (9th Cir.), cert. denied, 342 U.S. 829, 72 S.Ct. 53, 96 L.Ed. 627 (1951) (prisoner in federal penitentiary not permitted to make efforts to secure publication of books written in prisons); Kelly v. Doud, 140 F.2d 81 (7th Cir.), cert. denied, 321 U.S. 783, 64 S.Ct. 639, 88 L.Ed. 1075 (1944) (prisoner denied right to receive religious literature). An indication of the direction in which the law is moving in this area is found in Pierce v. LaVallee, 293 F.2d 233 (2d Cir. 1961). Singling out the first Morris case and Kelly v. Doud, Judge Clark disregards cases which would permit abridgment of constitutional safeguards in the name of the "internal discipline" doctrine and concludes that an allegation by a prisoner that he is main-

tained in solitary confinement because of his religious beliefs and that he is not permitted to purchase the Koran state a claim under the Civil Rights Act which the district court should entertain. Id., 293 F.2d at 235.

3. It is undisputed that parole rights are a matter of clemency and grace. United States ex rel. Bongiorno v. Ragen, 146 F.2d 349, 352 (7th Cir.), cert. denied, 325 U.S. 865, 65 S.Ct. 1194, 89 L.Ed. 1985 (1945). Cf. Woods v. Steiner, 207 F.Supp. 945 (D.Md.1962), and cases cited therein, at 951.

4. Robinson v. California, note 1 supra, 370 U.S. at 676, 82 S.Ct. at 1425, 8 L.Ed.2d 758 (concurring opinion).