John V. CAROTHERS, Plaintiff,

v.

Harold W. FOLLETTE, Warden, Green Haven Prison, Stormville, N. Y., A. P. Gilligan, Deputy Warden, Green Haven Prison, Stormville, N. Y., H. Sawner, Principal Keeper, Green Haven Prison, Stormville, N. Y., Defendants.

No. 68 Civ. 3927.

United States District Court,
S. D. New York.

July 15, 1970.

William Bennett Turner, New York City, for plaintiff.

Louis J. Lefkowitz, Atty. Gen., State of New York, for defendants, by Mortimer Sattler, Asst. Atty. Gen., New York City.

MANSFIELD, District Judge.

In this suit by a prisoner at Green Haven State Prison in New York against the Warden and other officials of that prison for injunctive relief and money damages, federal jurisdiction has been invoked pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1343(3) and 1651. Plaintiff seeks an injunction restraining defendants from

(1) censoring correspondence between himself and his attorney and any judge, and threatening to punish him for statements in such correspondence; or in letters to his parents;

(2) placing plaintiff in solitary confinement (euphemistically known as "segregation") or depriving him of "good time" without procedures that provide minimum due process safeguards;

(3) enforcing prison regulations restricting help inmates may give to each other in the preparation of legal papers;

and an order requiring defendants to

(4) restore to plaintiff some 46 days of "good time" lost during confinement in punitive segregation imposed for a letter written to a state court judge;

(5) restore to plaintiff some 60 days of "good time" lost as punishment for criticism of the prison administration in a letter written by plaintiff to his parents; and

(6) restore his parole eligibility, to which he is entitled if he is credited with the "good time" lost, and refer his case to the first available meeting of the Parole Board.

*Background of the Action*

In 1964 plaintiff was sentenced by the New York State Supreme Court, Orange County, after conviction on charges of grand larceny, assault and attempted robbery, to consecutive terms totalling from 8¾ years to 17½ years. His *pro se* complaint here, which was drawn by him prior to the appointment of counsel, is prolix but understandable. It sets forth a parade of wrongs allegedly committed against him by prison officials at Green Haven Prison. These include suppression of legal matter addressed by him to the New York State Supreme Court, punitive segregation in solitary confinement, placement in a "stripped cell," denial of privileges, poor food and loss of "good time" that would otherwise have been earned. He further alleges that these activities have been part of a conspiracy to harm and intimidate him. He charges that as a result of a letter written by him to the New York State Commissioner of Corrections he was interrogated, intimidated, "keep-locked," and threatened with further punishment if he should persist in his attempt to communicate with the Commissioner. He alleges that § 140 of the New York Correction Law, McKinney's Consol. Laws, c. 43, which authorizes a prison warden to impose solitary confinement, violates the Eighth Amendment's prohibition against cruel and unusual punishment, that he has been unconstitutionally prohibited from rendering legal assistance to fellow inmates, and that his legal publications and materials have been seized as contraband.

Defendants' answers amount to a general denial of the allegations of wrongdoing on their part.

Following the appointment of counsel to represent him, plaintiff served interrogatories upon defendants which have been answered and on December 11, 1969, the depositions of plaintiff and of defendants Follette and Sawner and Correction Officer Kuhm were taken at Green Haven State Prison. An application for preliminary injunctive relief

was then made upon the affidavit of plaintiff's counsel, the answers to interrogatories, and transcripts of the depositions. Pending a hearing by the State Parole Board to determine whether petitioner might be paroled, which was held in April, 1970, and resulted in denial of his release, we deferred our decision. Thereafter the parties stipulated pursuant to Rule 65(a) (2), F.R.C.P., that trial of the action might be advanced and consolidated with the hearing on the application, which we have approved. The facts are set forth below in our discussion of petitioner's principal contentions.

### Jurisdiction

■ Our jurisdiction to grant injunctive relief under Title 42 U.S.C. § 1983 supplements, and is concurrent with, such jurisdiction as has been granted by New York State to its courts in the same area. McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L. Ed.2d 622 (1963); United States ex rel. Campbell v. Pate, 401 F.2d 55 (7th Cir. 1968); Sostre v. McGinnis, 334 F.2d 906 (2d Cir.), cert. denied, 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96 (1964); Sostre v. Rockefeller, 309 F.Supp. 611 (S.D.N. Y.1969); Holt v. Sarver, 300 F.Supp. 825 (E.D.Ark.1969); Miller v. Purtell, 289 F.Supp. 733 (E.D.Wis.1968); Burns v. Swenson, 288 F.Supp. 4 (W.D.Mo. 1968); Jackson v. Bishop, 268 F.Supp. 804 (E.D.Ark.1967), reversed on other grounds, 404 F.2d 571 (8th Cir.1968); Jones v. Willingham, 248 F.Supp. 791 (D.Kan.1965); Talley v. Stephens, 247 F.Supp. 683 (E.D.Ark.1965); United States ex rel. Hancock v. Pate, 223 F. Supp. 202 (N.D.Ill.1963).

■ The Supreme Court's decision in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), established

that exhaustion of state court *legal* remedies is not required as a condition to seeking relief here. While the Second Circuit in Wright v. McMann, 387 F.2d 519 (2d Cir. 1967) (especially the concurring opinion of Chief Judge Lumbard), thereafter questioned whether state court *equitable* remedies should not first be exhausted, that issue has since been resolved by the Supreme Court in the negative. Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968); Damico v. California, 389 U. S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); Talley v. Stephens, 247 F.Supp. 683 (E. D.Ark.1965); Jackson v. Bishop, 268 F. Supp. 804 (E.D.Ark.1967), reversed on other grounds, 404 F.2d 571 (8th Cir. 1968). Hence, although the recently enacted New York statutes[1] which empowers New York state courts to grant injunctive relief to state prisoners, apparently passed in response to Wright v. McMann, creates a source of equitable relief parallel to § 1983, it does not prevent acceptance of jurisdiction by a federal court.

Some question may still exist as to whether exhaustion of state *administrative* remedies is required. See Judge Friendly's opinion in Eisen v. Eastman, 421 F.2d 560, 567 (2d Cir. 1969). However, we need not face that issue in this case for the reason that the only administrative avenue open to plaintiff as a means of protesting or appealing from the punishment imposed upon him by the one-man disciplinary "board" was to write a letter to the Warden, which is clearly inadequate and hardly worthy of classification as an administrative procedure, particularly since there is no suspension of imposition of discipline pending the Warden's consideration of such a

---

[1]. Civil Rights Law, McKinney's Consol. Laws, c. 6, § 79–c provides:
 "A convict sentenced to imprisonment is under the protection of the law, and any injury to his person, not authorized by law, is punishable in the same manner as if he were not sentenced or convicted.

 "Nothing in sections seventy-nine or seventy-nine-a of this chapter shall be deemed to deny a convict sentenced to imprisonment the right to injunctive relief for improper treatment where such treatment constitutes a violation of his constitutional rights."

letter.[2] Furthermore, prior to his deposition Warden Follette had not attended a disciplinary hearing in a "long time" and that might incline him to defer to the board's decision. (Follette Dep. at 26)

■■ There remains the question of whether we should not abstain from exercise of our concurrent jurisdiction. When we are asked to enjoin or revise state prison procedures our every instinct would be to favor abstention, particularly if the state had in effect a system of administrative review, or if difficult questions of state law were presented. In such instances we should proceed cautiously for the same reasons that led Congress to require exhaustion of state remedies by a state prisoner seeking release by writ of habeas corpus, 28 U.S.C. § 2254.[3] Maintenance of workable federal-state relations and economy of effort would normally be furthered by abstention.

■ In the present case, however, we fail to find any plausible grounds for such abstention. Despite the frequency of attacks on the constitutionality of New York State prison procedures, see Wright v. McMann, *supra*; Sostre v. McGinnis, 334 F.2d 906 (2d Cir.), cert. denied, 379 U.S. 892, 85 S.Ct. 168 (1964); Sostre v. Rockefeller, 312 F. Supp. 863 (S.D.N.Y. May 14, 1970), we have not been advised of the adoption by New York of any administrative procedures comparable to those found in other states.[4] Nothing in the present complaint raises "an unresolved question of state law the decision of which may 'avoid or modify' several constitutional questions," or will result in the " 'possible disruption of complex state administrative processes.' " See Coleman v. Ginsberg, 428 F.2d 767 (2d Cir. 1970). The administrative relief described by Warden Follette is the antithesis of a "complex system." Furthermore, even if plaintiff had sued under § 79-c of the state Civil Rights Law, the state court would be required initially to apply federal constitutional standards. At some point we must do the same. To abstain, therefore, would merely be to postpone the inevitable. Accordingly, we must re-

2. The following colloquy between plaintiff's counsel and Warden Follette is instructive:

"Q Is there any formal procedure for appealing from the decision?

"A Yes, very definitely.

"Q What is that?

"A The aggrieved inmate can write a letter, write a note to me, and I will discuss the matter with the deputy warden.

"Q Can he appeal before the punishment is imposed?

"A Many of them do. Many of them present their case to me first.

"Q You mean before the hearing?

"A Before the hearing, sure.

"Q If a punishment is imposed at the hearing, can they appeal to you before the punishment is imposed?

"A No; it wouldn't make any difference. anyway. If there was something wrong with the punishment, Mr. Turner, we would certainly rectify it. I can recall a case, when I was a deputy warden at Clinton Prison, rectifying an error that was a full year old.

Here was a case where a man was placed in segregation and lost compensation, and we restored that lost compensation because there had been an error made, so we try to be inherently fair in this process.

"Q You could not restore the year that he had spent in segregation, though?

"A We readily agreed that we couldn't do this, but thank goodness he didn't have to spend that extra time."

3. For instance, when a civil rights action under § 1983 is a subterfuge for a habeas corpus petition, federal courts will refuse to review the petition unless the petitioner has exhausted his state remedies. Kalec v. Adamowski, 406 F.2d 536 (7th Cir. 1969); King v. McGinnis, 289 F.Supp. 466 (S.D.N.Y.1968).

4. See Missouri Personnel Informational Pamphlet outlining the state penitentiary's Rules & Procedures (Sept. 1967); American Correctional Association, Manual of Correction Standards, Chap. 24 (1966); ALI Model Penal Code, § 304.7 (2) (Proposed Official Draft, 1962); cf. President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Corrections 13, 82–85 (1967); Cupp v. Swenson, 288 F. Supp. 1 (W.D.Mo.1968).

**1020**

luctantly proceed to review the prison actions which are the subject of the present suit.

### The Prison's Handling of Plaintiff's Correspondence and Imposition of Punishment Based on it

Plaintiff claims that prison practices in the handling and censorship of his mail violate his First Amendment rights, that punishment threatened and imposed upon him violates his Eighth Amendment rights, and that prison disciplinary procedure denies him due process.

Turning to the evidence received with respect to the first of these claims, it is the prison's practice in handling prisoner's mail, as revealed in depositions and answers to interrogatories, for prison officials to read all correspondence mailed by prisoners, including communications addressed to judges, legislative officials, attorneys, and private parties. (Follette Dep. at 59) Officials also assert the prerogative of deleting any portion of correspondence between an inmate and his attorney which the officials do not consider relevant to the prosecution of the inmate's legal affairs. (Follette Dep. at 31; Ans. to Interr. 8) The deletion is made either by striking the material or cutting off the portion in which the irrelevancy is included. (Follette Dep. at 31) Copies are made of any letters to a judge in which the prisoner complains of treatment or the institution (*id.* at 30, 31; Ans. to Interr. 6), so that prison officials will have advance warning of any possible litigation that might be instituted against them, and will be able to investigate the complaint and answer inquiries by the court. The officials do not believe that they can refuse to mail correspondence addressed to a court or an attorney, but can if addressed to private parties.

■ Plaintiff objects specifically to the treatment by prison officials of three of his letters. On August 12, 1968, he wrote a letter (Ex. 4) to Judge Supple, a Dutchess County, New York Supreme Court Justice, with reference to an Article 78 proceeding pending before that judge which plaintiff had instituted against Warden Follette. Among other things the plaintiff stated in the letter that he had been the victim of a "calculated plan or system of harassment visited upon my person by the officers of this institution which, I submit, has been directed by the Warden." He then described several instances where he claimed that he had been wrongfully charged and punished for infractions which he had not committed.

The letter to Judge Supple was dispatched by prison officials as written. On August 14, 1968, plaintiff was summoned before a disciplinary board and charged with "making false and lying statements about the administration of the prison." The board, which consisted only of defendant Sawner, an Assistant Deputy Warden, acted on the complaint of Kuhm, Correction Officer, who had read plaintiff's letter in his capacity either as prison censor or notary and who considered plaintiff's statements concerning harassment by the prison officials to be fallacious. On the same date plaintiff was sent to segregation (solitary confinement) for an indefinite term. He remained there for the next 4½ months.

Warden Follette contends that the discipline resulted from three other violations.[5] However, three contempora-

5. "On July 3, 1968, he was reported for Possession of contraband in his cell; on August 9, 1968, he was reported for creating a disturbance in Building 13 with another inmate; on August 12, 1968, he was cited for the above reports and intimidating an officer and refusing to comply with a 15-day no yard restriction imposed on August 9, 1968, for the infraction on that date. It was the culmination of these three disciplinary reports which resulted in plaintiff being placed in the Segregation Unit on August 14, 1968." (Follette Ans. to Interr. No. 25(b))

neous prison reports indicate that plaintiff was sent to solitary because of the letter. The "Daily Journal" prepared by the Deputy Warden, which includes a "daily report of every infraction of the rules and regulations of the prison by officers or inmates, and the action taken on each case * * *" for August 12, 1968, notes that plaintiff was sent to "segregation" for "making false and lying statements about the administration of Green Haven Prison" and lost 30 days of good time for "failure to comply with a 15 days no yard restriction." (Plf's Ex. 4) The same notation for August 12, 1968, is included in the "report of punishments imposed during the week ending August 17, 1968" (Plf's Ex. 7), and again appears in that part of plaintiff's prison record called "Disciplinary Action" except that the date applicable to the punishment of segregation was August 13, 1968. (Plf's Ex. 9)

Prison officials contend that these reports are inaccurate because of stenographic mistakes. They point instead to a report of disciplinary action taken in connection with the letter which was signed by Deputy Sawner. The report indicates that the complaint was filed on August 13, 1968, and the case heard on August 14. Plaintiff pleaded not guilty and the complaint was "dismissed" because plaintiff was "already in segregation." (Plf's Ex. 10; Sawner Dep. at 10) Defendants further point to the record reporting disciplinary action taken for failure to comply with the "no yard" restriction filed on August 12, 1968, which was also heard on August 14 and to which plaintiff pleaded guilty. The judgment was "segregation and 30 days lost time" and the record was signed by Deputy Sawner. (Plf's Ex. 11) After reviewing the testimony and exhibits we find that plaintiff was put in segregation because of his violation of the "no yard" restriction rather than because of his letter to Judge Supple.

Plaintiff next complains of prison interference with two letters he addressed to his court-appointed attorney in the present action, for which he was not disciplined. A prison official who was monitoring correspondence at some point during 1969 (the date is not specified in the record) refused to mail a letter sent by plaintiff to his attorney. The reason for this interception is not indicated. When Warden Follette learned of it, he immediately permitted plaintiff to send the letter. (Follette Dep. at 38–40)

On March 26, 1970, after the papers were submitted in this case, plaintiff notified his attorney that prison officials had once again refused to send a letter addressed to the attorney. Plaintiff indicated that the letter had been returned to him because it contained "prison news." The attorney, who supplied this information in an affidavit, states that he has not yet received the letter. The failure of plaintiff's attorney to receive the letter was first asserted in the attorney's supplemental affidavit dated April 2, 1970 (after argument of plaintiff's motion) and has not been answered by defendants. There is no contention that plaintiff has been disciplined or punished because of his letters to his legal counsel.

Lastly plaintiff protests the prison's action concerning a letter dated September 30, 1969, written by him while in segregation to his parents, which prison officials never mailed. The letter included the following comments for which petitioner was punished: "The prison system in New York State stinks * * *. The people in charge are not qualified * * *. Half the employees did not get out of high school * * *. This gang of political appointees * * *. Hanky-panky with U.S. mail * * *. Anything to obstruct legal work."

On September 30, 1968, the date when the letter was intercepted, prison officials convened a disciplinary board, which again consisted solely of defendant Sawner and charged plaintiff with "making derogatory and lying statements" about prison officials. Sawner found plaintiff guilty and as discipline

he stripped him of 60 days of "good time" already earned and 30 days use of radio earphones.

■ We will discuss first plaintiff's contention that the prison's handling of his letters to Judge Supple and his attorney amounted to a denial of his constitutional right to communicate with court and counsel with respect to his legal rights. Defendants concede that prisoners have a constitutional right of access to the courts, Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); Cochran v. Kansas, 316 U. S. 255, 62 S.Ct. 1068, 86 L.Ed. 1453 (1942); Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941), and that encompassed within the protection of that right is the right to dispatch mail to the courts, Stiltner v. Rhay, 322 F.2d 314 (9th Cir. 1963), cert. denied, 376 U.S. 920, 84 S.Ct. 678, 11 L.Ed.2d 615, rehearing denied, 376 U.S. 959, 84 S.Ct. 972, 11 L.Ed.2d 978 (1964), and to the prisoner's attorney. McCloskey v. State of Maryland, 337 F.2d 72 (4th Cir. 1964); Fulwood v. Clemmer, 206 F.Supp. 370 (D.D.C.1962).

Plaintiff contends that these constitutional rights to communicate with court and counsel are meaningless so long as prison authorities insist upon reading his letters to the court and censoring his letters to his counsel and that defendants should be required to forward such letters unread and uncensored. Defendants, on the other hand, argue that they must have the right to read letters addressed to the court in order to meet charges asserted by prisoners and to answer inquiries from the court itself resulting from prisoners' letters addressed to it. With respect to letters addressed to counsel, defendants, relying upon the decision of the New York Court of Appeals in Brabson v. Wilkins, 19 N.Y.2d 433, 280 N.Y.S.2d 561, 227 N.E.2d 383 (1967), contend that while the prisoner may write to his attorney about legal matters and prison conditions, they have the right to censor such letters in order to guard against improper non-legal messages that might have the effect of undermining prison security. Thus prison officials assert that they, rather than the prisoner and his counsel, should be the arbiter as to what constitutes attorney-client communications.

■ Except for the unsupported statement that "even judges have from time to time fallen by the wayside," (Sattler Aff. at 7), defendants apparently concede that maintenance of prison security does not require them to read a prisoner's letters to the court. Assuming, as we do, that from time to time prisoners misrepresent prison conditions to the court and make unwarranted charges and complaints, we fail to see how such conduct justifies disclosure to prison authorities of their entire correspondence with the court.[6] The desire to be apprised of such matters to facilitate answering inquiries from the court does not, in our view, constitute adequate justification for examination of the prisoner's communication to the court. If the court should decide to follow up any complaint, the prison authorities would then be in a position to obtain the relevant portions of the prisoner's letter from the court so that appropriate investigation might be made.

■ Regardless of whether the mere reading of a prisoner's letter to the court, standing alone, justifies action on our part, however, we believe that the imposition of punishment or threat of such punishment based upon a prisoner's statements or complaints to the court about prison conditions chills the prisoner's exercise of his First Amendment right to voice legitimate complaints, and thus would amount to a form of deterrent censorship. In the present case, for instance, even if we accept at face

6. We note that censorship of correspondence with courts, attorneys and various officials is precluded in the federal prisons and is limited to an inspection for contraband with no authority to read, copy or delete any material. See Hirschkop and Millemann, The Unconstitutionality of Prison Life, 55 Va.L.Rev. 795, 826 nn. 165, 166 (1969).

value defendants' contention that the prison records are erroneous and that plaintiff was not segregated because of statements made to Judge Supple about harassment, it is undisputed that following transmittal of the letter disciplinary proceedings were instituted against the prisoner on the charge of making false and lying statements to the court about the administration of the prison. That charge (accepting defendants' version of the facts) was dismissed only because plaintiff was "already in segregation," which implies that some punishment, possibly segregation, would otherwise have been imposed.

Plaintiff's correspondence with his attorney presents a closer question. Defendants concede that they have no right to refuse to forward a prisoner's letters to his counsel with respect to legal matters or complaints of unlawful treatment,[7] and it was undoubtedly in recognition of plaintiff's rights in this respect that Warden Follette directed that a letter intercepted by prison authorities be transmitted to plaintiff's lawyer. On the other hand, defendants contend that unless they are permitted to censor a prisoner's letters to his attorney, the attorney may sometimes be used as a conduit for transmission of dangerous messages to third persons such as plans for escape or the smuggling of contraband into the prison.

Faced with this issue the New York Court of Appeals, by a 4–3 vote in Brabson v. Wilkins, *supra*, authorized state prison officials to censor such communications. However, we do not believe that the facts in the present case squarely raise the issue, at least until the defendants are afforded an opportunity to answer the charge made in the supplemental affidavit of plaintiff's counsel dated April 2, 1970. In view of Warden Follette's direction that the first letter be transmitted to plaintiff's coun-

sel, we cannot assume that he directed that the second one be withheld. We therefore find it unnecessary to decide, as did Judge Motley in Sostre v. Rockefeller, 312 F.Supp. 863 (S.D.N.Y.1970), whether *Brabson* is in accord with plaintiff's federal constitutional rights.

Plaintiff does not question the right of prison authorities to censor his letter to his parents. In exercising that power, however, defendants intercepted and withheld the letter entirely because of the various above-quoted phrases criticizing prison conditions and charged him with the offense of "making derogatory and lying statements about the Department of Correction and administration of this Institution." Plaintiff argues that defendants thereby violated his First Amendment rights.

In considering whether defendants' handling of plaintiff's letter to his parents was justified, we start with the Supreme Court's oft-quoted statement that "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnstone, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). We further recognize that the administrators of the state prison unquestionably possess vast experience, which we do not, upon which to base their regulations and practice in the handling of prisoners consigned to their custody. At the same time we are also guided by the principle that "[a] prisoner retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law," Coffin v. Reichard, 143 F.2d 443, 445 (6th Cir. 1944), cert. denied, 325 U.S. 887, 65 S.Ct. 1568, 89 L.Ed. 2001 (1945), and this is especially true of the preferred freedoms of the First Amendment. Walker v. Blackwell, 411 F.2d 23 (5th

---

7. It would be improper for prison officials to delete any communication by the prisoner to his attorney that concerned his suits, no matter how critical of prison officials. See In re Ferguson, 55 Cal.2d 663,

12 Cal.Rptr. 753, 361 P.2d 417, cert. denied sub nom. Ferguson v. Heinze, 368 U.S. 864, 82 S.Ct. 111, 7 L.Ed.2d 61 (1961).

Cir. 1969); Jackson v. Godwin, 400 F.2d 529 (5th Cir. 1968).

 Accordingly, we conclude that any prison regulation or practice which restricts the right of free expression that a prisoner would have enjoyed if he had not been imprisoned must be related both reasonably, Sostre v. McGinnis, 334 F.2d 906 (2d Cir.), cert. denied, 379 U.S. 892, 85 S.Ct. 168, 13 L. Ed.2d 96 (1964); cf. Labat v. McKeithen, 243 F.Supp. 662 (E.D.La.1965), aff'd, 361 F.2d 757 (5th Cir. 1966), and necessarily,[8] Barnett v. Rodgers, 133 U. S.App.D.C. 296, 410 F.2d 995 (1969); Jackson v. Godwin, 400 F.2d 529 (5th Cir. 1968); Coffin v. Reichard, 143 F.2d 443 (6th Cir. 1944), cert. denied, 325 U. S. 887, 65 S.Ct. 1568 (1945); Cf. Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960), to the advancement of some justifiable purpose of imprisonment. For instance, a prison regulation restricting freedom of expression would be justifiable if its purpose were to rehabilitate the prisoner or maintain the security and discipline that is an obvious concomitant of incarceration. See Walker v. Blackwell, *supra*; Jackson v. Godwin, 400 F.2d at 532; Long v. Parker, 390 F.2d at 820. A prisoner could be punished only if he acted or threatened to act in a way that breached or constituted a clear and present danger of breaching the justifiable regulation. Long v. Parker, 390 F. 2d 816 (3d Cir. 1968); Cooper v. Pate, 382 F.2d 518 (7th Cir. 1967); Knuckles v. Prasse, 302 F.Supp. 1036 (E.D.Pa. 1969); Banks v. Havener, 234 F.Supp. 27 (D.D.C.1964).

 Certain restrictions on expression to persons outside the prison are clearly justified, such as those aimed at preventing plans to escape; the beginning or continuation of an illegal scheme and perhaps even a legitimate business (see Stroud v. Swope, 187 F.2d 850 (9th Cir. 1951), cert. denied, 342 U.S. 829, 72 S.Ct. 53, 96 L.Ed. 627 (1951); or maintenance of correspondence with a person whom the prison officials believe will deter rehabilitation, Stroud v. Swope, *supra;* Fussa v. Taylor, 168 F.Supp. 302 (M.D.Pa.1958); Desmond v. Blackwell, 235 F.Supp. 246 (M.D.Pa.1964), aff'd, Long v. Blackwell, 351 F.2d 950 (3d Cir. 1965), vacated, 384 U.S. 32, 88 S.Ct. 1285, 16 L.Ed.2d 333 (1966), on remand, sub nom. Long v. Parker, 390 F.2d 816 (3d Cir. 1968).) Other restrictions have also been approved: Lee v. Tahash, 352 F.2d 970 (8th Cir. 1965) (number of people to whom prisoner could write limited to 12); United States ex rel. Lee v. People of State of Illinois, 343 F.2d 120 (7th Cir. 1965) (prisoner could possess only 15 letters in his cell for fire reasons).

 , Applying these principles here, if the state had given some explanation for the prison's interception of the letter to his parents in the present case that indicated the action was reasonably and necessarily related to prison security or the prisoner's rehabilitation, we would be reluctant to interfere with its internal administration and regulations. See Wright v. McMann, 387 F.2d 519 (2d Cir. 1967). However, after careful review we fail to find any plausible basis for defendants' action. In the first place the state does not indicate what regulation was violated. The charge does not seem to correspond to any of the 14 reasons listed on the prison paper used by the prisoners, which must be followed before the prison will post the letter.[9] The closest is "It [the letter] contains criminal or prison news."

---

8. Compare Hatfield v. Bailleaux, 290 F.2d 632 (9th Cir. 1961); cf. Long v. Parker, 390 F.2d 816 (3d Cir. 1968).

9. These include:
 "1. You did not sign it properly.
 2. You did not fill out stub properly.
 3. Name of addressee has not been approved.
 4. Letters addresse[d] to General Delivery not permitted to be mailed.
 5. It contains criminal or prison news.
 6. Begging for packages or money not allowed.
 7. You are not permitted to receive the articles requested in your letter.

It can hardly be contended that plaintiff's comments intended for his parents would threaten prison security, much less present a clear and present danger to the discipline of the prison. He was in solitary confinement when he wrote the letter and there is not the slightest hint that he was attempting or had ever attempted to proselytize others in the prison by use of views of a political, ideological or religious nature likely to create antagonism in the prisoners within the prison walls.[10] Cf. McCloskey v. Maryland, 337 F.2d 72 (4th Cir. 1964).

Nor is there any indication that plaintiff's comments intended for his parents would retard his rehabilitation, unless that word is to be defined as abject acceptance of all prison conditions, however unjustifiable. Without professing any expertise in the area we doubt whether preparation of a prisoner for return to civilian life is advanced by deadening his initiative and concern for events within the prison itself.[11] Cf. Walker v. Blackwell, *supra* (Black Muslims could correspond with Elijah Muhammad, their spiritual leader, to seek spiritual advice); but cf. Desmond v. Blackwell, *supra* (correspondence with Elijah Muhammad denied). Correspondence with outsiders, particularly members of the family, would appear to be an obvious aid in fostering these interests. Carping of the sort expressed in plaintiff's letter seems an understandable reaction by a man who feels wronged, as plaintiff did when he was sent to solitary. Furthermore, such comments, even if they momentarily cause chagrin to prison officials, may act as a form of healthy cartharsis in the case of an introvert.[12] The action of prison officials in finding that such

---

8. The articles requested can only be received new from the dealer.

9. Correspondence with newspapers or newspaper employees not permitted.

10. You cannot have a visit with the person named unless approved by the warden.

11. Inmate who wrote letter for you did not sign his name.

12. Special Letters must not be submitted Saturday, Sunday or Holidays.

13. You did not stick to your subject.

14. You have no Stamps on deposit."

10. The communication here, for instance, does not approximate the possible threat suspected in the correspondence and religious practices requested by the Black Muslims. The dogma of the religion has been discussed at length, see, e. g., Knuckles v. Prasse, 302 F.Supp. at 1049–1053, and its potential for conflict noted. Yet courts—albeit uneasily—have ordered prison authorities to permit the Muslims to exercise their religion and receive literature so long as a clear and present danger of disruption did not result. See, e. g., Walker v. Blackwell, *supra*; Knuckles v. Prasse, *supra*.

11. In Barnett v. Rodgers, 133 U.S.App. D.C. 296, 410 F.2d 995, 1002 (1969), the District of Columbia Circuit Court said: "That penal as well as judicial authorities respond to constitutional duties is vastly important to society as well as the prisoner. Treatment that degrades the inmate, invades his privacy, and frustrates the ability to choose pursuits through which he can manifest himself and gain self-respect erodes the very foundations upon which he can prepare for a socially useful life. Religion in prison subserves the rehabilitative function by providing an area within which the inmate may reclaim his dignity and reassert his individuality. * * * [Footnotes omitted]"

The Fifth Circuit in Jackson v. Godwin, 400 F.2d 529, 535 (5th Cir. 1968), has also said:

"[T]o the extent that prison regulations are designed to teach the prisoners to live in conformity with the norms of society, the sporadic and discretionary enforcement of unreasonable regulations, it appears to us, is more likely to breed contempt of the law than respect for, and obedience to it. Unrestricted, arbitrary and unlawful treatment of prisoners would eventually discourage prisoners from cooperating in their rehabilitation."

See also Landman v. Peyton, 370 F.2d 135 (4th Cir. 1966), cert denied, 388 U.S. 920, 87 S.Ct. 2142, 18 L.Ed.2d 1367 (1967).

12. Consider the testimony by a doctor concerning prison life in Knuckles v. Prasse, 302 F.Supp. 1036, 1057 n. 16 (E.D.Pa.1969):

"A. The tension—of course, the prison community itself is a distinct culture * * *.

statements, uncommunicated to other prisoners, constituted an offense, strikes us as an unjustifiable overreaction.

We turn to plaintiff's contention that the punishment imposed on him was so disproportionate to his conduct that it violated his Eighth Amendment rights. Since we have already indicated our view that his letters did not constitute a threat to the discipline and security of the prison or to his own rehabilitation, almost any substantial punishment would be unreasonable. See Sostre v. Rockefeller, *supra*; Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968); Holt v. Carver, 300 F.Supp. 825 (E.D.Ark. 1969); Roberts v. Pepersack, 256 F. Supp. 415 (D.Md.1966), cert. denied, 389 U.S. 877, 88 S.Ct. 175, 19 L.Ed.2d 165 (1967); cf. Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962); Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958); United States ex rel. Metesky v. Johnston, 70 Civ. 71 (S.D.N.Y. May 6, 1970). The proof here discloses that substantial punishment was indeed visited upon plaintiff by the disciplinary board.

If plaintiff had been placed in solitary confinement for 4½ months because of his letter to Judge Supple, we would have no difficulty finding that the punishment was unlawful, not only because it penalized his exercise of a constitutional right, but because it would be grossly disproportionate to the alleged offense and constitute cruel and unusual punishment in violation of the Eighth Amendment. However, we have found that plaintiff was punished because of his violation of the no yard restriction rather than because of his letter to Judge Supple, and while the punishment appears to have been extremely harsh, we cannot on the record before us say that it was cruel and unusual. Furthermore, in view of our conclusions below as to the lack of procedural due process in the imposition of the punishment, we find it unnecessary to decide this question.

In addition plaintiff was stripped of 60 days of accumulated good time because of his letter to his parents. Good time is awarded for good conduct and reduces the period of a sentence which a prisoner must spend in prison although it does not reduce the period of the sentence itself.[13] Colin v. New York State Parole Board, 13 A.D.2d 555, 213 N.Y.S.2d 381 (1961); McKinney v. Taylor, 358 F.2d 689 (10th Cir. 1966) (interpreting 18 U.S.C. § 4165). Under § 230(2) of the New York Correction Law, a prisoner may earn up to 10 days reduction of his sentence for each 30 days "efficient and willing performance of duties assigned." No good time can be earned by a prisoner in segregation.

The state contends that the award or loss of good time pertains solely to the prisoner's life inside the prison itself and is therefore unreviewable by a federal court because it is within the

---

In fact, one of the sayings that is always said in most books that you open up is that the hardest, the worst thing about prison is living with prisoners because it is a restricted community and there is no escape.

Even in the ghetto, you can get out of a ghetto with its tensions and its problems and its restrictions but there is no escape in a prison and this is why any type of disturbing influence raises this tension level in a confined environment such as a prison * * *.

"Q. Would it be safe to describe it as a more volatile situation than the ordinary communal situation?

"A. Yes, because of its restrictive nature, because there are few safety valves or few emotional-releasing outlets available to the prisoner."

13. New York Correction Law § 230(2) provides:

"Every prisoner confined in a state prison or penitentiary * * * may receive, for good conduct and efficient and willing performance of duties assigned, a reduction of his sentence not to exceed ten days for each month of the minimum term in the case of an indeterminate sentence, or of the term as imposed by the court in the case of a definite sentence. The maximum reduction allowable under this provision shall be four months per year, but nothing herein shall be construed to confer any right whatsoever upon any prisoner to demand or require the whole or any part of such reduction."

ambit of internal administrative control. It is true that good time is a creature of state statute, Earnest v. Willingham, 406 F.2d 681 (10th Cir. 1969); New York Correction Law § 230(2), that there is no constitutional right to it, People ex rel. Schussler v. Denno, 143 N.Y.S.2d 690 (Sup.Ct. Westchester Co. 1955); Douglas v. Sigler, 386 F.2d 684 (8th Cir. 1967); Medlock v. Burke, 285 F.Supp. 67 (E.D.Wis.1968), and that a prisoner may lose good time earned as a disciplinary measure, Smoake v. Willingham, 359 F.2d 386 (10th Cir. 1966); Patton v. Ross, 267 F.Supp. 387 (E.D. N.C.1967). For present purposes, however, the important fact is that good time accelerates the point at which a prisoner is eligible for parole and thus directly relates to the duration of his incarceration. Since denial of good time is a matter of substance plaintiff presents a justiciable issue as to the constitutionality of discipline that affects it, and federal courts have jurisdiction over such a claim in a § 1983 action. United States ex rel. Campbell v. Pate, 401 F.2d 55 (7th Cir. 1968); United States ex rel. Hancock v. Pate, 223 F.Supp. 202 (N.D.Ill.1963).

The state's argument against federal jurisdiction is but a disguised reiteration of the now rejected "right-privilege" distinction. The fact that the state is not obligated to extend the benefit of good time does not empower it arbitrarily to remove the good time a prisoner has earned, or his opportunity to earn it, while leaving another prisoner's good time unaffected. See Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Escalera v. New York City Housing Authority, 425 F.2d 853 (2d Cir. 1970); Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv. L.Rev. 1439 (1968); Note, Another Look at Unconstitutional Conditions, 117 U.Pa. L.Rev. 144 (1968).

Plaintiff's loss of 60 days accumulated good time in the present case constituted serious punishment not only because it may have lengthened his prison term but because it deprived him of the opportunity to appear under more favorable circumstances before the Parole Board for consideration for release on parole. For the reasons already indicated we believe that this punishment was disproportionate to the alleged offense.

Plaintiff's third ground urged as a basis for relief is the alleged unconstitutionality of the procedure employed by the disciplinary board which punished him. At Green Haven Prison a prison disciplinary hearing is conducted by a "board" manned by one member of the prison staff, usually either the deputy warden, assistant deputy warden (Sawner, for example), or a captain (Follette Dep. at 26). In most instances the prisoner is not informed of the charge before he arrives before the board but occasionally a guard will explain it to him particularly if the prisoner is placed in a cell as a result of the alleged infraction. (Follette Dep. at 27) The prisoner is not entitled to any representation. No witnesses are presented and he is not permitted to call witnesses. However, "if he [the prisoner] felt that the charge was wrong and that he could substantiate this with other witnesses, the deputy warden would certainly postpone the hearing right there and he would assign a sergeant to conduct an investigation to contact other inmates * * *." (Follette Dep. at 28) The only record made of the hearing is a statement of the charge, the plea, the decision, and the punishment. (Follette Dep. at 28) The prisoner is permitted to appeal the decision to the Warden by letter, although it is not clear whether this is explained to the prisoner. (Follette Dep. at 29)

In considering plaintiff's claim that the disciplinary procedure at Green Haven denies him due process, we recognize that prison officials are not dealing with a group of genteel citizens noted for their law-abiding characteristics. On the contrary most present a constant threat of unruliness and have already engaged in serious anti-social activities leading to their imprisonment. If essential prison discipline is to be maintained,

therefore, prison officials must be given flexibility, and as Judge Foley in the Northern District has recently said: "Summary and swift procedures are necessary to process the day-to-day disciplinary infractions," Rodriquez v. McGinnis, 307 F.Supp. 627 (N.D.N.Y. 1969). If, for instance, a prisoner engages in violence or violation of rules governing his physical conduct toward guards or fellow prisoners, prison officials must have the power to take immediate action. It also appears that prison officials are called upon to deal with thousands of infractions each year. Assistant Deputy Warden Sawner, for instance, speculated that he alone has presided at over 3,000 disciplinary hearings annually.

 We are not penologists. However, despite the peculiar and difficult problems inherent in prison administration, we cannot accept defendants' contention that the essential elements of fundamental procedural fairness—advance notice of any serious charge and an opportunity to present evidence before a relatively objective tribunal— Sostre v. Rockefeller, supra; cf. Goldberg v. Kelley, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1969); Escalera

v. New York City Housing Authority, supra; Burns v. Swenson, 288 F.Supp. 4 (W.D.Mo.1968)—must be dispensed with entirely because of the need for summary action or because the administrative problems would be too burdensome. See United States ex rel. Marcial v. Fay, 247 F.Supp. 662 (2d Cir. 1957), cert. denied, 355 U.S. 915, 78 S.Ct. 342, 2 L.Ed.2d 274 (1958) (administrative efficiency does not outbalance constitutional rights). Although a prisoner does not possess all of the rights of an ordinary citizen he is still entitled to procedural due process commensurate with the practical problems faced in prison life. We believe that the procedures used to discipline plaintiff failed to measure up to such minimum standards. The result has been a serious loss to plaintiff: 4½ months in solitary confinement, loss of the opportunity to earn 46 days good time while in such confinement, and loss of 60 days accumulated good time with a possible adverse effect on his parole eligibility. We need not review all of the horrors of solitary confinement, which are fully disclosed in the record before us [14] and in Judge Motley's recent opinion in Sostre v. Rockefeller, supra.[15]

14. Plaintiff's brief details the differences between life in what is euphemistically termed the "normal population" and solitary confinement.

"The inmate in segregation is not allowed to have a job or work in the prison industrial program (Follette dep., 15); he cannot participate in the educational program (Id.); he cannot go to religious services (Id.). He is not allowed to receive newspapers or magazines (Id. at 16); his commissary privileges are restricted and he is not allowed to buy food products (Id. at 11). His correspondence privileges are limited (Id. at 12). While Carothers was in segregation, no visits were permitted for the first 30 days in segregation, although this rule has now been changed (Id.). The inmate is not permitted to go to the movies or to watch television and may not listen to the radio for the first 30 days (Id. at 10, 12). He is allowed only one hour of recreation per day, and must strip naked and submit to a search of his body before going to the recreation yard (Id. at 9). He is not allowed to smoke for the first 30

days (Id. at 13). Segregated inmates eat in their cells and not with fellow prisoners (Id.). Their diet is restricted in that they do not receive desserts, pastries or apples (Id. at 8; Carothers dep., 37–38). While Carothers was in segregation, sheets were not allowed for the first 30 days, although this rule has now been changed (Follette dep., 9). Segregated inmates do not have hot water, except for one shower per week, and are not permitted to have a hairbrush (Follette dep., 10). When Carothers was sent to segregation he was kept naked for several hours (Carothers dep., 28), was not given a toothbrush or toothpaste for 2–3 days and was not given a blanket for 5 days. (Id. at 29). At the time, he was working on a coram nobis petition, but did not gain access to his legal materials for five days (Id. at 29–30). While Carothers was in segregation, a fellow inmate confined near him committed suicide (Follette dep., 18)." (Plf's Brief, pp. 11–13)

15. It must be noted that it is not unconstitutional to use solitary confinement as

We believe that such serious punishment should not be allowed to stand, at least until disciplinary procedures are adopted that will meet rudimentary standards of due process under the conditions encountered. A proceeding pursuant to such standards may then well result in a much lighter punishment than segregation.

Other jurisdictions have been able to establish basically fair and reasonable procedures suited to prison conditions.[16] We see no reason why Green Haven Prison cannot do the same without endangering the prison's security or the rehabilitation of inmates. Rather than formulate procedural regulations, federal courts have usually ordered the state to submit proposed rules. Landman v. Peyton, 370 F.2d 135 (4th Cir. 1966); Sostre v. McGinnis, *supra*; Sostre v. Rockefeller, *supra*. As the Supreme Court recently said in Goldberg v. Kelley, 397 U.S. 254, 267, 90 S.Ct. 1011, 1020 (1969), a case involving the procedural requirements a state must follow to terminate welfare aid:

> "We recognize, too, that both welfare authorities and recipients have an interest in relatively speedy resolution of questions of eligibility, that they are used to dealing with one another informally, and that some welfare departments have very burdensome caseloads. These considerations justify the limitation of the pre-termination hearing to minimum procedural safeguards, adapted to the particular characteristics of welfare recipients, and to the limited nature of the controversies to be resolved. We wish to add that we, no less than the dissenters, recognize the importance of not imposing upon the States or the Federal Government in this developing field of law any procedural requirements beyond those demanded by rudimentary due process." (397 U.S. at 267, 90 S.Ct. at 1020)

The foregoing appears to be the proper approach here because prison authorities obviously have a far greater understanding than we do of the administrative problems confronting them. However, for our purposes, we do not even think it necessary to make such an order, because Judge Motley has already recently done so in Sostre v. Rockefeller, *supra*. We are confident that prison officials will adopt more reasonable procedures in order to preclude further speculation that they fear review of prison life and prison administration.

### Legal Assistance to Inmates

Plaintiff has been "reprimanded" for giving legal assistance (Follette Dep. at 4; Ex. 9; Interr. 28) and has indicated that he may wish to give or seek advice in the future, but that he is inhibited by prison regulations on the subject which are claimed to be unconstitutional. In Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), the United States Supreme Court declared that unless reasonable alternatives to legal assistance were provided, a state prison regulation that barred inmate legal assistance was unconstitutional.

Prison officials may promulgate reasonable rules concerning legal assistance given by one prisoner to another, United States ex rel. Scott v. LaVallee, F.Supp. (S.D.N.Y. Oct. 28, 1969) (69 Civ. 2627). The policy of the New York State prison system is that "inmates may not demand legal aid or assistance from an employee or other inmate of the institution." (Follette Dep. at 41; Petitioner's Ex. 3). Warden Follette interpreted this to mean that although prisoners are not entitled to legal assistance from other prisoners "they may request it, and if the request is valid, it would be granted." (Follette Dep. at 42) Rule 21 of the prisoner's handbook also provides that "Inmates are prohibited, except upon approval of the Warden,

---

punishment. Courtney v. Bishop, 409 F. 2d 1185 (8th Cir. 1969); Graham v. Willingham, 384 F.2d 367 (10th Cir. 1967); United States ex rel. Knight v. Ragen, 337 F.2d 425 (7th Cir. 1964), cert. de-

nied, 380 U.S. 985, 85 S.Ct. 1355, 14 L.Ed.2d 277 (1965); Roberts v. Barbosa, 227 F.Supp. 20 (S.D.Calif.1964).

16. See n. 4 *supra*.

to assist inmates in the preparation of legal papers." However, no standards are provided for determining when the Warden should approve. The matter is, therefore, left to his absolute discretion. See Prewitt v. Arizona, 315 F.Supp. 793 (D,Ariz.1969).

The state has not provided alternatives to prisoner assistance, which it may do under Johnson v. Avery. Prison officials are explicitly prohibited from giving assistance to prisoners (Ex. 3, *supra*), and "There are no persons officially available at Green Haven Prison to give legal assistance to inmates." (Defs' Ans. to Interr. No. 9) The fact that state courts accept papers of prisoners, no matter how inartfully couched, is not a reasonable alternative.

On the record now before us, we conclude that the state has not satisfied the *Johnson* test, and that defendants should be enjoined from disciplining petitioner if he should, upon request, furnish legal assistance to another inmate or request such assistance.

### Conclusion

After a thorough review of the evidence, we find that plaintiff has established by a fair preponderance of the evidence that:

1. Prison officials read all correspondence mailed by prisoners, whether addressed to judges, attorneys or private parties;

2. Prison officials refused to mail plaintiff's letter to his parents and disciplined him for some of the contents of that letter;

3. The prison disciplinary board, in placing plaintiff in solitary confinement and taking away earned good time, failed to accord him minimum procedural due process safeguards in violation of his rights under the Fourteenth Amendment of the Constitution;

4. Prison regulations concerning legal assistance one inmate may extend to another fail to meet constitutional requirements.

Plaintiff will suffer irreparable harm unless injunctive relief is granted.

Accordingly, it is ordered, adjudged and decreed that the defendants, their agents, officers, employees and successors, be, and are hereby permanently enjoined from:

1. Reading any correspondence addressed by the plaintiff to any court;

2. Disciplining plaintiff for anything written to a court or anything of a legal nature written to his attorney;

3. Placing plaintiff in solitary confinement or stripping him of good time without procedures complying with minimum constitutional due process requirements;

4. Disciplining plaintiff because of statements in letters written to persons outside prison walls unless such letters present a clear and present danger of disrupting prison security or some other justifiable purpose of imprisonment;

5. Violating the principles announced by the Supreme Court in Johnson v. Avery concerning legal aid inmates can give each other.

It is further ordered that the defendants, their agents, officers, employees and successors:

1. Restore to plaintiff 106 days of good time, representing the good time he lost while in solitary confinement (46 days), and the good time stripped from him as discipline for the letter to his parents (60 days); and

2. Refer his case to the first available meeting of the Board of Parole for reconsideration of its denial of release on parole.

Except insofar as relief has been granted, plaintiff's motion is denied.

The foregoing shall constitute the court's findings of fact and conclusions of law.

The court expresses its appreciation to William Bennett Turner, appointed counsel serving without compensation, for his able briefing and presentation of plaintiff's case.

Settle order.