451 F.2d 730
 Eugene RODRIGUEZ, and the United States of America ex rel.
Eugene Rodriguez, Plaintiff-Appellee,
v.
Paul D. McGINNIS, Commissioner of Correction; Russell G.
Oswald, Chairman of the Board of Parole; J. Edwin La-Vallee,
Warden and Chairman of the Prison Board of Clinton State
Prison; New York State Board of Parole; and the New York
State Department of Correction, Defendants-Appellants.
 No. 899, Docket 34567.
 United States Court of Appeals,
Second Circuit.
 Argued July 16, 1970.
Decided March 16, 1971.
 
 Richard A. Kohn, Albany, N. Y., for appellee.
 Brenda Soloff, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen., Samuel A. Hirshowitz, First Asst. Atty. Gen., Lillian Z. Cohen, Asst. Atty. Gen., on the brief), for appellant.
 Before WATERMAN, MOORE and HAYS, Circuit Judges.
 HAYS, Circuit Judge:
 
 
 1
 This is an appeal from an order of the United States District Court for the Northern District of New York in an action brought by a state prisoner under 28 U.S.C. Sec. 1343 (1964) and 42 U.S.C. Sec. 1983 (1964). After an evidentiary hearing, the district court held that the cancellation by defendants of 120 days of plaintiff's earned good behavior time,[1] was unconstitutionally imposed. The defendant Commissioner of Correction of the State of New York was ordered to restore the remaining period of good behavior time credit to plaintiff. As a consequence of this order plaintiff was released from prison on December 24, 1969, although remaining subject to the supervision of the New York Board of Parole. We reverse the judgment of the district court.
 
 
 2
 In view of the basis for our disposition, only a brief summary of the facts is necessary. Rodriguez, having been convicted in a New York state court of perjury and attempted grand larceny, was sentenced to imprisonment for an indeterminate term of from one and one-half years to four years. Under New York law, a prisoner serving an indeterminate sentence may elect to participate in a conditional release program by which he may earn up to 10 days per month good behavior time credit toward the reduction of the maximum term of his sentence. Appellee chose to elect this program. Optimally a prisoner so electing may be released under the supervision of the Board of Parole, after having served but twothirds of his maximum sentence, Correction Law Sec. 803 (McKinney's Consol. Laws, c. 43, 1968), Penal Law Secs. 70.30 (4) (a), 70.40(1) (a) and (b) (McKinney's Consol. Laws, c. 40, 1967); accrued good behavior allowances so earned, however, may at any time be withdrawn in whole or part for bad behavior or for violation of institutional rules. Correction Law Sec. 803(1) (McKinney 1968).
 
 
 3
 Appellee was charged in two separate disciplinary action reports dated October 31, 1968, with possession in his cell of five contraband letters written by his wife, and with having six pornographic photographs of his wife in his possession received through illegal channels. The Deputy Warden adjudged that 120 days of the prisoner's earned good behavior time should be cancelled as punishment, "60 days for the letters and 60 days for the pictures." In the "Remarks" section of each judgment was a statement to the effect that appellee had refused to disclose how he had managed to get possession of the uncensored items. The district judge found that this and various other disciplinary actions meted out to Rodriguez (segregation in Sing Sing for a day and a half, segregation in Clinton Prison for several weeks) were really designed to compel these disclosures from appellee. He believed that the imposition of the penalty was a deprivation of Rodriguez' right to due process because the prison regulations prescribed no penalty for refusal to inform. He further found that the Commutation Board at Clinton Prison, which reviews all cases involving forfeiture of good time, failed to comply with a statute directing the Board to forward its reasons for the disallowance of the good behavior time in writing to the Commissioner of Correction and he characterized this failure as the chief basis for his ruling. Correction Law Sec. 236 (McKinney 1968). We cannot agree with the trial judge's view that questions of constitutional significance are involved.
 
 
 4
 Even if we were inclined to affirm the decision on the merits we would be compelled to reverse on the ground that appellee has failed to exhaust his state remedies.
 
 
 5
 Section 2254(b) and (c) of Title 28 U.S.C. require state prisoners who apply for federal habeas corpus to show that they have exhausted state remedies. State prisoners are increasingly resorting to the Civil Rights statutes in order to circumvent the requirements of Section 2254. The present application, since it seeks release from custody, is in fact an application for habeas corpus. "[R]elease from penal custody is not an available remedy under the Civil Rights Act." Peinado v. Adult Authority, of Dept of Corrections, 405 F.2d 1185, 1186 (9th Cir.), cert. denied, 395 U.S. 968, 89 S.Ct. 2116, 23 L.Ed.2d 755 (1969). In Johnson v. Walker, 317 F.2d 418, 419-420 (5th Cir. 1963) the court said:
 
 
 6
 "Use of the Civil Rights Statutes to secure release of persons imprisoned by State Courts would thus have the effect of repealing 28 U.S.C. Sec. 2254; of course, such was not the intent of Congress."The "chief basis" of the district court's order is founded on error. The provision of Sec. 236 of the Correction Law under which the prison commutation boards forward their reasons for disallowing good behavior time in writing to the Commissioner of Correction is not constitutionally required. Moreover, a letter from Warden Deegan to Commissioner McGinnis dated November 1, 1968 (Defendant's Exhibit "C") was sufficient to satisfy the statutory requirement, since it contained all the information that would have been included in a letter from the Board to the Commissioner. In any case, even if the requirement of Sec. 236 had federal significance, the most that appellee would be entitled to is a decree ordering the board to forward a report to the Commissioner.
 
 
 7
 Although punishment for refusing to reveal the sources of his contraband would not reflect any constitutional infirmity, it is quite clear that Rodriguez did not lose his good behavior time for refusal to inform but for possession of the contraband. After the punishment was ordered he was given an opportunity to reduce his lost good time credit by revealing the source of the contraband. This procedure, commonly used in law enforcement efforts, certainly does not violate any constitutional right.
 
 
 8
 The issue in this case is typical of the increasing number of trivial questions of internal prison discipline now being brought, in the first instance, before the federal courts. If the results were not so serious for the administration of justice through state and federal procedures, the spectacle of a federal court of appeals solemnly deciding on the penalty in terms of good time a state prisoner should receive for having dirty pictures in his cell (or for refusing to be a tattle tale) would be so absurd as to be laughable. But if this court entertains actions of this kind it will encourage state prisoners who have any kind of "beef" to bring such actions and the federal courts will end up sitting as prison boards of discipline in the state prisons.
 
 
 9
 The federal courts should refuse to interfere with internal state prison administration except in the most extreme cases involving a shocking deprivation of fundamental rights. See, e. g., Church v. Hegstrom, 416 F.2d 449, 450-451 (2d Cir. 1969); Wright v. McMann, 387 F.2d 519, 528 (2d Cir. 1967) (concurring opinion of Lumbard, Ch. J.); Sostre v. McGinnis, 334 F.2d 906 (2d Cir.), cert. denied, 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96 (1964); Jackson v. Bishop, 404 F.2d 571, 577 (8th Cir. 1968) (Blackmun, C. J.). A case such as the instant one, which is totally devoid of merit, should be dismissed out of hand.
 
 
 10
 At a minimum such cases should first be filtered through the state prison administrative process and the state courts. In Wright v. McMann, Chief Judge Lumbard said:
 
 
 11
 "We are not called upon this time to decide whether Wright would be heard upon his constitutional claims in federal court without first applying for statutory relief in a state court if the New York legislature had given to inmates of its prisons the right to apply for injunctive relief against improper treatment. I would hold that if a state made provision for such relief in its courts the federal courts should abstain for a reasonable period to allow the state courts to hear the complaint and take appropriate action. I do not agree that recent decisions of the Supreme Court mandate or were intended to mandate action by federal courts in all cases involving the treatment of prisoners in state institutions, without a suitable period of abstention where state courts are empowered to hear the case and where there is reason to believe that the state would grant relief if the complaint were well founded. The disciplining of state prisoners is so peculiarly a matter in the discretion of the state, and the possibilities that prisoners will file groundless and numerous complaints in the federal courts are so obvious, that these cases raise 'special circumstances' that make it appropriate to treat them as an exception to the caveat or policy against abstention by federal courts."
 
 
 12
 The prisoner should be remanded to serve the sixty odd days remaining of his sentence, or, if he chooses, to make an application through state administrative or judicial processes for the relief he seeks.
 
 WATERMAN, Circuit Judge (dissenting):
 
 13
 I respectfully dissent. I would affirm the judgment entered in the Northern District of New York.
 
 
 14
 In this action brought by a state prisoner under 28 U.S.C. Sec. 1343 and 42 U.S.C. Sec. 1983, Judge James T. Foley, Chief Judge of the United States District Court for the Northern District of New York, after an evidentiary hearing in which the prisoner and the state officer defendants testified and presented exhibits, adjudged that the cancellation by defendants of 120 days of plaintiff's earned good behavior time which, if not canceled, would have reduced his period of incarceration by 120 days was unconstitutionally imposed. The district judge therefore ordered that the defendant Commissioner of Correction of the State of New York restore the remaining period of good behavior time credit to plaintiff. As a consequence of this order plaintiff, although remaining subject to the supervision of the New York State Board of Parole, was entitled to an immediate release from prison, and he was so released on Christmas Eve, 1969.
 
 
 15
 The facts are fully set forth in the able opinion filed below by Judge Foley in Rodriguez v. McGinnis, 307 F.Supp. 627 (N.D.N.Y.1969), and need to be but briefly reiterated for the purpose of this dissenting opinion.
 
 
 16
 On February 14, 1967, Rodriguez was sentenced in a New York State court to imprisonment for an indeterminate term of from one and one-half years to four years. According to New York law, a prisoner serving an indeterminate sentence may elect to participate in a conditional release program whereby he may earn up to 10 days per month good behavior time credit toward the reduction of the maximum term of his sentence. Optimally, under this program, a prisoner may be released, under the supervision of the Board of Parole, from prison incarceration after having served but two-thirds of his maximum sentence, Correction Law Sec. 803, Penal Law Secs. 70.30(4) (a), 70.40(1) (a) and (b), but accrued good behavior allowances so earned may at any time be withdrawn in whole or in part for bad behavior or for violation of institutional rules. Correction Law Sec. 803(1). Appellee chose to elect the conditional release program.
 
 
 17
 On October 30, 1968, while he was imprisoned in Sing Sing, Rodriguez was charged in a "disciplinary action" report with having in his possession five uncensored, and therefore contraband, letters written to him by his wife. He was similarly charged on the following day with having in his possession six uncensored pornographic photographs of her. These items were taken from him and turned over to the Deputy Warden. On October 31 it was adjudged by the prisoner's interrogator, the Principal Keeper, the Deputy Warden, that 120 days of the prisoner's earned good behavior time were canceled in order to punish him, "60 days for the letters and 60 days for the pictures." The judgment entered on each of the reports set forth that appellee refused to disclose how he managed to get possession of the uncensored items.[1] Judge Foley, upon hearing appellee's testimony, discredited the "disciplinary action" reports to the following extent, 307 F.Supp. at 631:
 
 
 18
 /s/ R. Treanor
 
 Asst. Superintendent
 
 19
 The plaintiff's version given at the trial contradicts these disciplinary reports. He testified he was never confronted with written charges or the contraband. From the beginning, and I so find, the questioning was solely in regard to how he got the uncensored letters and photographs into Sing Sing.
 
 
 20
 It is clear that, as Judge Foley found, the real motive behind the continuing pattern of punishment, first the cancellation of the 120 days good behavior time earned by a year's good behavior at Sing Sing, second, the immediate incarceration in the "Box" there for a day and a half, and third, the prompt transfer to Clinton Prison following that incarceration, where the confinement in segregation lasted from entry there on November 1 until the first week in December, was not designed to punish Rodriguez for his possession of uncensored mail but rather was designed to compel him to disclose the channel through which he obtained the uncensored items, or, as the majority says, to "tattletale."
 
 
 21
 Judge Foley also found that the Commutation Board at Clinton Prison, which reviews all cases in which good time has been forfeited by a disciplinary officer, failed to obey the command of the New York staute, and did not forward in writing to the Commissioner of Correction its reasons for withholding appellee's good behavior time. Correction Law Secs. 235, 236.
 
 
 22
 Based on the above, the experienced district judge expressed concern that this pattern of events may well not have comported with "ordinary due process requirements" and stated, "* * * I am not sure the disciplinary officer or an officer of a review board can assume legally the investigative mantle and become prosecutor, judge and jury, and in this instance really the Appellate Court of Review." 307 F.Supp. at 632. I share his concern.
 
 
 23
 The judge indicated, also, that "the chief basis" for his decision was the failure of the prison commutation board to forward the reasons for its action to the Commissioner and that this failure deprived appellee of due process and equal protection of the law. Id.
 
 
 24
 Had Judge Foley found that the prison authorities had only proceeded against Rodriguez by confronting him with a charge of violating prison rules in that he possessed uncensored items, had given him a full opportunity to answer only those charges, and then had failed to forward to the Commissioner of Correction the reasons for taking away good behavior time as punishment for the infractions, I would not consider such a statutory violation to constitute such a deprivation of due process as to warrant a federal tribunal in granting relief. However, on the facts found by Judge Foley, it is my belief that this panel has no other valid option but to conclude that the procedures appellee was subjected to in relation to the uncensored mail did not meet the minimum constitutional requirement of "fundamental fairness."
 
 
 25
 Rodriguez began his drawn out confrontations with prison officials over a simple infraction of prison rules, the possession of uncensored material. Although he was "officially" charged with that simple infraction, official attention soon focused on Rodriguez's refusal to "tattletale" and to incriminate others who might have aided him in receiving the contraband.[2] It is apparent from the severity of his punishment, first, the wiping away of a year's accrued credit for a year's good behavior and the resulting assessment of four months additional incarceration, and second, segregation "in the Boxes" of the two prisons for a total of more than 40 days, that the punitive measures were not inflicted for possession of uncensored letters and photographs but in order to coerce him to tattletale and to divulge information that would inculpate other residents of Sing Sing.
 
 
 26
 *****
 
 
 27
 * * *
 
 
 28
 It would seem, then, that the failure of the commutation board to forward its reasons for its actions was merely a part of the pattern of continued procedural dereliction Judge Foley found; and, as the facts he found are not clearly erroneous, and, on the record, I am not convinced that Judge Foley made any mistake in finding the facts as he found them, I approve the conclusion that he necessarily drew from these facts that the coercive procedures adopted by the prison authorities to obtain Rodriguez's confession did not comport with the due process the accused, then a prisoner in custody, was entitled to.
 
 
 29
 Although not raised before the court below, or considered there, appellee urges us to hold that the imposition of this punishment because he remained silent in the face of interrogation was a violation of his fifth amendment privilege against self-incrimination, citing Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967). The defendants respond by pointing out that Rodriguez at the hearing before Judge Foley admitted having the uncensored items in his possession and that his refusal to talk was not motivated by any fear of criminal prosecution for possessing the items. This is most assuredly so as to the possession of the contraband, but the prison authorities' questions were not directed at seeking a confession with respect to the contraband; no confession was necessary or needed, he was "caught with the goods." The questions were directed at discovering how the letters and photographs were smuggled past prison censors. The obvious import of the interrogation was the discovery of the identity of the "insider" or "insiders" (prison guards, etc.) who must have enabled Rodriguez to receive the uncensored items. Had Rodriguez answered the prison officials and implicated certain persons employed by the prison, he would also, of course, be implicating himself in the conspiracy to circumvent censorship and he could reasonably expect further developments to follow any disclosure he might make.[3] The ramifications of the interrogation were twofold. The information sought would not only open the door for a probable criminal charge against a prison official but also, as Rodriguez would also be a party to the official's criminal act, a possible criminal charge against Rodriguez.[4]
 
 
 30
 Rodriguez may have been motivated to remain silent solely because of a fear of retaliation by his confederate, whether a prison guard or other prison employee, or even another inmate. But the fifth amendment protection protects irrespective of the subjective motives that prompt one to be silent. If the information sought by officers may tend to incriminate one who is being questioned, he has an absolute right to remain silent. Although "[a]nswers may be compelled regardless of the privilege if there is immunity from federal and state use of the compelled testimony or its fruits in connection with a criminal prosecution against the person testifying," Gardner v. Broderick, 392 U.S. 273, 276, 88 S.Ct. 1913, 1915, 20 L.Ed.2d 1082 (1968), (citing cases), no immunity from prosecution was offered in this case to Rodriguez. Nor is it any answer to say that if Rodriguez had talked under the compulsion of the threats of segregation in the box and the loss of good time credits such compulsion would have rendered his statements or the fruits thereof "coerced" and therefore inadmissible against him in a criminal prosecution. See Garrity v. State of New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). Absent an assurance that his statements could not be used against him, we cannot assume appellee was aware of any implicit immunity he would enjoy if criminal charges for a complicity in violation of law were brought against him. Cf. Gardner v. Broderick, supra at 278-279, 88 S.Ct. 1913.
 
 
 31
 I would point out, therefore, that under the circumstances present in this case the fifth amendment privilege against self-incrimination was a bar to the punishment imposed-punishment which obviously was not imposed for the possession of uncensored letters and photographs but imposed solely for the purpose of compelling appellee to divulge incriminating information. However, the pertinence of the fifth amendment's protection was not brought to the attention of the trial court and I find it unnecessary to uphold the decision below by reliance upon it. With reference to the issue that was presented to Judge Foley, his factual findings are not clearly erroneous and his conclusion drawn therefrom that appellee was deprived of due process seems to me to be incontrovertible. I would affirm.
 
 
 
 [1]
 Credit for such time would have reduced appellee's period of incarceration by 120 days
 
 
 [1]
 The pertinent notations as to the letters follow:
 JUDGMENT
 
 
 [60]
 days
 Remarks: Inmate refuses to disclose who had arranged to get the contraband letters to him.
 /s/ R. Treanor
 Deputy Warden
 letters held in Warden's office.
 The pertinent notations as to the photographs follow:
 JUDGMENT
 
 
 [60]
 days. Inmate was adamant in refusal to disclose method by which the pornographic photographs were passed to him
 Remarks:
 Pictures held in Warden's office.
 
 
 [2]
 Rodriguez testified as to the initial Sing Sing confrontation as follows:
 I was in the visiting room. My wife was visiting me, and an officer came over and told her that the visit was terminated. She left. I was told to remain. A few minutes later, the officer took me to the Warden's office. * * * The Warden said to me "How did you get these uncensored letters into Sing Sing?"
 I told him I had nothing to say. He then summoned somebody else and told him "Take him to the box."
 Rodriguez testified with reference to the second confrontation at Sing Sing that he was taken from the box to the Deputy Warden's office by a guard. The colloquy follows:
 He said to me, the first thing he said to me, is "Look, Gene, I know that it is a waste of time asking you anything, but I want to know how uncensored letters got into Sing Sing." I said, "I have nothing to say." He said-he then said, "If you don't tell me I am going to take sixty days for the letters and sixty days for the pictures, to run consecutively." I didn't say anything. He then said, "I can give you back this lost time, give you back all your lost time." I said, "I have nothing to say."
 Q. Now is that the end of the conversation with the P. K.? A. That was it.
 Q. And how long were you in this room, total time? A. Oh, wait, there was something else that was said. He said, "You are being transferred to Clinton." He said, "You are being transferred to Clinton, Gene, tomorrow." I said, "Thanks for telling me." Then he said, "Good luck to you." I said, "Good luck to you." We shook hands and I walked out. I was there two minutes or maybe three minutes.
 Upon his arrival at Clinton Prison Rodriguez testified that he was immediately taken away to the box there without any further hearing. As to the confrontations at that prison, Rodriguez testified:
 While I was in the box on three separate occasions the Warden weekly would have me brought up to his office * *. The Warden would have me brought up to his office and he said to me-what he did was this. He said "Sit down." When I sat down he said, "Look, you are an educated man * * *."
 The Court: How often did he do this?
 The Witness: He did it three times.
 The Court: All right.
 The Witness: He did it three consecutive weeks. He said, "Look, you are an educated man." The first time "I want to know how the unauthorized letters got into Sing Sing. I don't like to keep you in the box. You didn't do anything at Clinton but I have to as part of the continuing investigation." I said, "I have nothing to say." He said, "You are going to continue to lose good time and you are going to stay in the box." He said, "We have it narrowed down to two men anyway, so that if you tell us you will save yourself all this aggravation." So I answered him, I said, "Well, if you have it narrowed down to two men, then you don't need me."
 So he had me taken out.
 
 
 [3]
 See N.Y.Penal Law Sec. 20.00 and, for example, N.Y.Penal Law Sec. 200.00
 
 
 [4]
 See, e. g., among several penal provisions, N.Y.Penal Law Secs. 195.00, 195.05, 200.00, 200.20, 205.20