**Eddie ADAMS et al., Plaintiffs,**

v.

**Norman CARLSON, Director, Federal Bureau of Prisons, et al., Defendants.**

**Civ. No. 72-153.**

United States District Court, E. D. Illinois.

Jan. 15, 1973.

---

Michael Deutsch, National Lawyers Guild, Jeffrey Haas, Dennis Cunningham, Chicago, Ill., Arnold Jochums, Carbondale, Ill., for plaintiffs.

Henry A. Schwarz, U. S. Atty., Frederick J. Hess, Asst. U. S. Atty., East St. Louis, Ill., for defendants.

## MEMORANDUM AND ORDER

FOREMAN, District Judge:

The matter before the court is plaintiffs' Motion for a Preliminary Injunction. The four named plaintiffs are inmates of a segregation unit at the Federal Penitentiary at Marion, Illinois, and they filed this suit as a class action on behalf of all prisoners confined in segregation since on or about July 23, 1972. The defendants are the Director of the Federal Bureau of Prisons, and the Warden, an associate warden, and a correctional officer of the Federal Penitentiary at Marion. I have permitted this matter to be treated as a class action for purposes of the hearing on the Motion for a Preliminary Injunction.

Plaintiffs seek an order of this court for a preliminary injunction barring defendants from:

a) Denying plaintiffs adequate food, clothing, medical care, exercise, showers, and other basic necessities of life.

b) Gassing, suffocating or imposing any other physical or mental abuse upon plaintiffs.

c) Confiscating and destroying plaintiffs personal belongings including legal papers, briefs and correspondence.

d) Denying plaintiffs reasonable access to their attorneys.

e) Placing plaintiffs into indefinite punitive segregation without providing hearings with full due process safeguards.

f) Denying plaintiffs their constitutional right to exercise freedom of religion and speech.

Essentially four issues are raised by plaintiffs' motion: (1) Cruel and unusual punishment; (2) Access to Courts; (3) Procedural due process; and (4) The First Amendment rights of freedom of speech and religion.

A two-day hearing on the motion was held and counsel for plaintiffs and defendants have agreed that previous testimony taken at a hearing on a Motion for a Temporary Restraining Order should be considered by the court on the present motion. Both plaintiffs and defendants have submitted affidavits for the court's consideration. The facts pertinent to each issue will be set forth along with the discussion of the respective issues. However, at the outset it should be noted that the actions for which plaintiffs seek redress occurred after they were placed in segregation as a disciplinary measure after they engaged in or instigated a work stoppage in violation of prison rules on July 17, 1972. There was a major disruption of

prison life and the officials were, in effect, faced with an outright mutiny. Prompt and effective action to deal with an unusual situation was required to restore the prison to normalcy.

On November 21, 1972 Judge Henry S. Wise, Chief Judge for the Eastern District of Illinois, ordered that the cases of Ben F. Daughtery v. G. W. Pickett, et al, Civil No. 72–180–D; Joe Charles Nix v. G. W. Pickett, et al, Civil No. 72–229–D; Edd Johnson v. George W. Pickett, et al, Civil No. 72–230–D be consolidated with this matter. On November 22, 1972 Judge Wise ordered James L. Potts v. Norman A. Carlson, et al, Civil No. 72–231–D consolidated with this cause. It appearing that no new issues are raised in these consolidated cases and to the extent that the issues and parties are properly consolidated, the finding and conclusion herein made and the orders entered shall be applicable and binding upon the parties in the above named cases.

The Court will consider each of the four issues separately and will set forth the relevant facts with the discussion of each issue.

I. CRUEL AND UNUSUAL PUNISHMENT

Statements made in plaintiffs' complaint and motion for a preliminary injunction and comments and arguments made to this Court by counsel for plaintiffs would lead the Court to believe that the prison officials at the United States Penitentiary at Marion, Illinois arbitrarily, without cause, and on several occasions engaged in a course of conduct designed to harass, intimidate, injure and humiliate the inmates. Counsel for plaintiffs failed to note in their pleadings the nature of the situation and the atmosphere at the prison at the time of and since the work stoppage of July 17, 1972, as indicated by the testimony.

Plaintiffs argue that cruel and unusual punishment was inflicted upon them in that they were denied adequate food, clothing, medical care, exercise, showers and other basic necessities of life, in that they were gassed and suffocated, and in that the punishment inflicted, confinement in segregation, is so disproportionate to the alleged offense committed that it violated substantive due process. On the basis of the testimony given and the exhibits and evidence introduced, I make the following finding of facts.

The United States Penitentiary at Marion, Illinois, is *the* maximum security facility in the Federal Prison system. Some inmates are transferred to Marion from other federal institutions for security reasons and because of the facilities available there. In addition, from time to time, inmates are removed from the general population and placed in the segregation units and are so placed for disciplinary reasons because they have violated prison rules or regulations or have manifested behavior that jeopardizes their own safety or the well being of other inmates or the staff, or create a hazard to institutional security.

It is a prison rule that all able-bodied inmates must work and to refuse to do so is a violation of the rules which subjects the violator to discipline. On July 17, 1972, a general work stoppage occurred. The prison administration decided to keep all prisoners in their cells until the instigators could be determined, rather than force the prisoners who were willing to work to choose between defying the prison rules and defying the instigators of the work stoppage. On July 24, 1972, seven of the allegedly most prominent instigators of the work stoppage were placed in segregation and ten other inmates insisted on accompanying their friends in segregation. The following morning most of the inmates returned to work, although there was some reluctance, and many inmates were checking with others to see if they should work. On the afternoon of July 25, a disturbance in the hallways occurred preventing the men from returning to work, and the instigators of this work stoppage were placed in segregation. In all approximately 103 men were

placed in segregation as a result of their participation in the work stoppages.

On August 17, or in the early morning hours of August 18, a fire and general disturbance occurred in the segregation unit. The fire had apparently been started by inmates who burned their mattresses and threw them out of their cells and into the hallway. A lot of noise and shouting emanated from the unit and it was apparent a major disturbance was in progress. The prison officials who were involved in quieting the disturbance first obtained their riot gear. Upon arriving at the segregation units, they found the air smoke filled and found flooding of some cells and hallways. The flooding was caused by inmates who stopped up their toilets and sinks and flushed or turned on the water. The water supply to the cells was turned off to stop the flooding and the fires were quenched. Thereafter each inmate was informed that he was to strip his clothing, place his hands through the opening in the cell door to be handcuffed, and he would be removed from his cell so that the guards could strip his cell of the accumulation of property which could constitute a fire and security hazard. Order was restored without the use of gas or other physical force, and the men were returned to their cells. Associate Warden Fenton ordered that clothing be returned to the inmates, and apparently clothing was returned later that morning. Also later in the day or on the night of August 18, mattresses were returned to the inmates. Some inmates retrieved personal possessions from the hallway by use of fishlines or ropes made from clothing.

In the early morning hours of August 19, 1972, inmates of D–Range of segregation unit H threw their mattresses out into the hallway as a protest because they thought inmates in other ranges might not have mattresses. Again a general disturbance ensued and prison guards and officials came in riot gear to quell the disturbance. Each man was told to strip and submit to handcuffing prior to removal from his cell. Several men continued to shout, created a disturbance and refused to cooperate. Threats against staff were made and light fixtures and fluorescent tubes had been broken for possible use as weapons. Tear gas was used against several men to subdue them.

Some clothing was returned to the inmates immediately after it had been thoroughly searched for contraband and weapons. The weather at the time was hot and there is no evidence that anyone became ill or suffered physically because of the deprivation of clothing during the time of the search on either day. Many of the inmates had some of their other personal belongings returned to them, but most of the books and papers which they had accumulated in their cells and which could be considered as contraband and a threat to prison security and safety because of the fire hazard were removed from the segregation unit and stored elsewhere. Mattresses were not immediately furnished to cell inmates in segregation because many had been damaged or destroyed by the inmates during the events of August 18 and 19 and some time was required to replace them. Associate Warden Fenton testified that all inmates had mattresses no later than August 26 or 27.

Dr. David L. Schwartz, the Chief Health Officer at the Marion Prison, testified that he was at the prison in the early morning of August 19, 1972, in response to a call that there was a disturbance in the segregation units. He went to segregation in case anyone should be injured during the disturbance, however, there were no injuries. He further testified that he visits the segregation unit routinely at least weekly.

On October 14, 1972, inmates refused to surrender their plastic food trays and eating utensils. These, when broken, can be made into dangerous weapons. The following day a search of the cells was conducted. Three inmates of the segregation unit, including a named plaintiff, Eddie Adams, refused to submit to handcuffing prior to removal

from their cells. Apparently all but Adams eventually submitted to handcuffing. There was testimony from a fellow inmate that Adams became "paranoid" and refused to be hancuffed. Threats were made against the prison officers. Mace was used on Adams, and a number of men, from five to eight, went into Adams cell to attempt to subdue him without beating, but rather by overwhelming him. Adams made an indication of rushing or attacking the officers, and in the process of being subdued, he received a swollen eye, and a number of superficial abrasions, bruises, and scratches. The extent of the injuries was attested to by a medical doctor who examined him the next morning. No medical doctor was present at the time of the disturbance, however, a physician's assistant was, and he examined Adams at that time and determined that his injuries were not severe enough to require hospitalization.

On October 16, 1972, another search for weapons was conducted and a loaded percussion type gun made from a towel rack, toothbrush, nail, and lead was found in a light fixture in a cell in the segregation unit.

Since being subdued on October 15, 1972, Adams has complained of dizziness, blackouts and pain or sensitivity in the lower back area. Numerous x-rays have been taken of Adams and other objective tests administered. The tests were completely inconsistent with the complaints and Adams was considered a malingerer by the medical doctors at the prison.

Inmates in segregation are allowed a ten minute release from their cells each day for showers and shaves. They are afforded recreation and exercise periods of thirty minutes each on a rotating basis in the unit on the day shift. A physician's assistant visits the segregation unit daily and a physician weekly. The food supplied is the same provided the general population with some exception when an inmate has demonstrated a propensity to be dangerous or violent in which cases utensils are kept from them and they are served sandwiches or cold meals.

There was testimony that during the period of time after the disturbances of August 18 and 19, garbage was permitted to accumulate in the halls outside the cells of the segregation unit and that insects were entering through broken screens and causing a health hazard. Apparently the prisoners who had jobs as orderlies were ordinarily responsible for keeping the premises clean. During the time of the disturbances these duties were not performed. It appears, too, that the window screens had been torn and damaged by the actions of prisoners in the past. Further, the prison had a ventilation system for these units that obviated the need for open windows, however, the inmates preferred to have the windows open.

The cells of the segregation unit are ordinarily well lighted, furnished with a shelf bunk, mattress, sink, towels and a toilet. Inmates are permitted to keep personal items and reading materials in the cell. A number of the inmates, prior to the disturbance, had accumulated in their cells large amounts of clothing, books, papers, and other items, much of which was flammable. As a result of the fire and the danger of fire and security in the future, the accumulations were removed.

At the time this case and the various motions for interim relief were filed, counsel for plaintiffs alluded to the "shocking atrocities" that were allegedly occurring at the Marion Penitentiary. However, after a careful consideration and review of the testimony, evidence, and the record, I do not find wherein such atrocities occurred. The disruptive conduct of the inmates and the apparently explosive nature of the situation, as shown by the evidence, might warrant unusual means of coping with the usual situation. However, the Court is more concerned with the routine, normal, and customary handling of the prisoners in segregation rather than isolated instances at a time of riot or near or attempted riot.

■■ · It is the opinion of this Court that prison discipline remains largely within the discretion of the prison administrators. See Breeden v. Jackson, 457 F.2d 578 (4th Cir., 1972). The federal court should not interfere with prison administration except in the most extreme cases involving a shocking deprivation of fundamental rights. To do otherwise would encourage prisoners who have any kind of "beef" to seek redress in the federal courts, and the courts will end up sitting as prison boards of discipline. Rodriguez v. McGinnis, 451 F.2d 730 (2d Cir., 1971).

■■ In order for plaintiffs to prevail upon their contention that they were subjected to cruel and unusual punishment violative of the Eighth Amendment to the United States Constitution, the punishment, confinement or restraint inflicted must be termed "barbarous" or "shocking to the conscience," Church v. Hegstrom, 416 F.2d 449, 551 (2d Cir., 1969), or "violative of basic concepts of human decency." Wright v. McMann, 387 F.2d 519, 526 (2d Cir., 1967). Confinement in segregation does not itself constitute cruel and unusual punishment, even if it is indefinite, provided that such confinement is not otherwise abhorrent to basic principles of decency. See Sostre v. McGinnis, 442 F.2d 178 (2d Cir., 1971).

■ The evidence presented does not reflect any circumstances, when considered in light of the disturbances and atmosphere at this maximum security penitentiary, which even approach the level of a shocking deprivation of basic humane treatment or constitutional rights. The hardships imposed upon plaintiffs were a direct result of their violations of prison rules, their attempts to create disturbances amounting to near riots, and their threats to prison personnel and security, verbally, by actions, and by the concealment of contraband and weapons. Also noteworthy is the fact that the prisoners on occasion subjected themselves to sleeping without mattresses by voluntarily throwing their mattresses out of their cells. They cannot now by this bootstrap procedure claim cruel and unusual punishment was imposed. Nor will this Court interfere with the discipline imposed, the placement in segregation, as being disproportionate to the offense, since as noted above, no shocking atrocities or inhumane deprivation have been shown.

Plaintiffs' motion for a preliminary injunction with respect to the elements involved under the issue of cruel and unusual punishment is denied.

## II. ACCESS TO COURTS

Plaintiffs assert that their Fifth Amendment right of access to the courts has been improperly impaired by a number of acts of the defendants. They claim that their legal documents have been confiscated, some of them destroyed, and that they have limited access to them and other legal materials while in segregation. They assert that the installation of a glass partition and a phone system in the attorney's visiting room at the prison, and the inmates' suspicion that the phones are monitored, so interferes with the attorney-client relationship as to impair their Fifth Amendment right of access to the courts. They also allege interference with attorney mail, but no evidence was offered at the hearing to support this claim.

■■ First it is necessary to define what constitutional right is under scrutiny. The right of a prison inmate to reasonable access to the courts for his grievances arises out of the Fifth Amendment, Ex Parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941); Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); Younger v. Gilmore, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971). One concomitant of this right is the effective assistance of counsel, Goodwin v. Oswald, 462 F.2d 1237 (2d Cir., 1972). The Sixth Amendment's guarantee of counsel refers only to criminal prosecutions. Thus one seeking to show a violation of the Fifth Amendment must demonstrate

how the inmates' access to the courts is impaired by the alleged interference with the attorney-client relationship.

Associate Warden Fenton testified at an earlier hearing on a temporary restraining order (which testimony, as mentioned above, was incorporated by consent of both parties into the evidence now before the court) that a zip-gun was found in one of the cells in the segregation unit. He testified that the explosive charge found in this weapon was of such quality that he deemed it unlikely to have been procured from materials available within the prison. As a result more stringent security precautions regarding access to inmates in segregation were installed. The glass partition and phone system in the attorney's visiting room was a result. There was testimony at the hearing that some of the inmates feared that the phone line was "bugged," that it was impossible to confer with more than one attorney at once, and that it was difficult to pass documents back and forth at attorney-client meetings.

■■ The Court recognizes that the partition system is not ideal, but feels that it does permit minimal access of inmates to their attorneys. The parties may see and speak to one another, and documents may be put up to the the glass or passed in a sealed envelope via a guard. In view of the contraband problem and weapon found in the segregation unit, the Court cannot conclude that the defendants have abused the discretion afforded them in installing this stringent security measure. Under appropriate circumstances attorneys, like everyone else who contacts an inmate, are subject to reasonable security procedures. Marsh v. Moore, 325 F.Supp. 392 (D.Mass.1971). Specifically, plaintiffs have not demonstrated how this partition has materially interfered with the inmates' access to the courts.

■ The plaintiffs claim that the suspicion that the phone system is "bugged" by the defendants has a chilling effect on communications with their attorneys. There was no evidence presented at the hearing that the system is in fact monitored and plaintiffs failed to substantiate in any way that their suspicion had any reasonable basis in fact. Associate Warden Fenton denied that the phones were tapped. On this record the Court cannot presume that the defendants are engaging in such an improper practice.

■ There was testimony at the hearing that during the disruptive events in segregation of July and August legal materials of the inmates were seized, and some of them were destroyed. Some of the material apparently has been returned, and some has not. Inmate Larry Stead testified that on August 2 he witnessed legal documents which were torn and discarded. Scraps of what appears to be an appeal brief were admitted into evidence at the hearing. Inmate Lanier Ramer testified that plastic bags in which inmate property was held were placed in a garbage truck and destroyed. Inmate Throgmartin testified that complaints he had prepared and letters of recommendation for parole purposes were seized; Inmate Morrison claimed that an appeal he wanted to perfect was frustrated because his legal records were taken. Inmate Adams claimed that his lawyer's address was taken, and Inmate Mares claimed an inability to answer his attorney's inquiry as to his sentence because his legal records were seized. It is not clear from the record whether any or all of this material has been returned to the owners. Warden Fenton testified that Marion Policy Statement MI–2001.2B, admitted into evidence at the hearing, was fully in force at Marion, and that any destruction of legal material was in violation of his instructions. It is clear that destruction of legal documents essential to a pending proceeding raises Fifth Amendment issues, Dowd v. Cook, 340 U.S. 206, 71 S.Ct. 262, 95 L.Ed. 215 (1951); Sigafus v. Brown, 416 F.2d 105 (7th Cir., 1969). In this case the evidence was certainly sketchy as to what legal documents were destroyed, and at

whose direction; and there is almost a complete lack of evidence as to what actual access to the courts was prevented by the alleged destruction of legal materials. Without a doubt prison authorities have some discretion in dealing with the amount of material an inmate can keep in his cell. Walker v. Pate, 356 F. 2d 502 (7th Cir., 1966); Sostre v. McGinnis, 442 F.2d 178 (2d Cir., 1971). In a riotous situation where fear of fire or contraband is real, the authorities certainly may remove materials from the cells. However, legal documents should not be destroyed. If they are to be removed from the cells, they should be inventoried and stored in a safe place. The inmates in segregation should then be afforded reasonable access to these materials, with special consideration to those who are working on particular legal deadlines. Marion Policy Statement, MI–2001.2B, introduced into evidence at the hearing, appears to provide for reasonable access by inmates in segregation to such legal materials.

 On the record before the Court, however, it is uncertain whether any legal materials relevant to any active or pending litigation or appeals were in fact destroyed by the acts of the defendants. Plaintiffs failed to prove any access to the courts was impaired, and that any such alleged destruction is of a continuing or threatened nature. Thus a case for injunctive relief has not been made, and such request as to this issue is denied.

## III. PROCEDURAL DUE PROCESS

The question of due process is raised with reference to the procedures involved in removing an inmate from the general population and placing him in segregation. As noted above, the plaintiffs were placed in segregation as a disciplinary measure because of their participation in a work stoppage in violation of prison rules.

Plaintiffs allege and there was testimony to the effect that they were placed in segregation without any explanation; that they were not informed of the charges against them until from three to nine days after being placed in segregation; that they were not given written copies of charges prior to or during any hearing pertaining to their confinement in segregation; that they received no prior notice of such hearing; that they were not allowed to face or cross-examine their accusers, nor allowed to call witnesses in their own behalf; and that they were not allowed to have counsel or counsel substitute represent them at the hearing. Plaintiffs argue from the above allegations and testimony that defendants failed to comply with even minimal or rudimentary standards of due process as guaranteed by the Fifth Amendment to the Constitution.

At the Marion Penitentiary an Adjustment Committee has the authority and responsibility to determine when an inmate shall be held in segregation and when he can be returned to the general population of the prison. The testimony reveals that plaintiffs in this case were placed in segregation on or about July 23, 1972. A special adjustment committee was designated to consider their cases and because of the large number involved in the work stoppage, in excess of 100 inmates, some inmates apparently did not appear before the committee or receive notification of the charges against them for several days.

The procedure followed by the special and the regular adjustment committee consisted in bringing an inmate who had been placed or was to be considered for placement in segregation before the committee where the charges were read to him. The prisoner was asked to comment on the charges and was told which officer gathered the information for the charges, but he was not told who supplied the information. No additional evidence was presented and the committee rendered its decision on the basis of the information supplied by the charging officer and the prisoner's comments.

On July 17, 1972, the Marion Penitentiary adopted its Policy Statement MI–7400.5C, pertaining to disciplinary pro-

cedures, (Defendants Exhibit No. 2) which policy statement complies with and is essentially the same as the Bureau of Prisons Policy Statement on the subject, which was adopted June 6, 1972. (Plaintiffs' Exhibit No. 16.) According to Associate Warden Fenton, who testified at the hearing, the procedures for placing a prisoner in segregation as set forth in that policy statement were not fully implemented until shortly before the hearing on this motion. The new procedures require written notice to the inmate of the specific charges of misconduct or rule violation within twenty-four hours of confinement in segregation. The inmate is given an opportunity to answer the charges, and an independent investigation of the charges is conducted within that twenty-four hour period by someone other than the reporting officer.

The Adjustment Committee is required to meet three times a week. Each inmate in segregation must be reviewed on his record at least weekly. If he remains in segregation for more than ten continuous days, his case is formally reviewed by the committee a second time and at least every 30 days thereafter while he remains in segregation. This review includes a personal appearance before the committee. After thirty days of continuous confinement in segregation, a psychiatric or psychological interview and report is required and is repeated at least every six months thereafter. The ten-day and thirty-day reviews must be documented, along with the committee's findings or decisions, and sent to the next higher authority for review, either the Associate Warden or the Warden, if the Associate Warden is on the adjustment committee.

The Adjustment Committee reports must include a specific statement of the offense, including the time and place of occurrence and a list of witnesses. The inmate's statement about the offense, a clear statement of conclusions of the committee, and the information to support the conclusion, must be included in the report. The inmate is informed in writing of the Committee's decision.

What procedural process is due a prisoner who is being disciplined for an infraction of prison rules is not a novel question. It has been raised and considered recently in numerous Federal District Courts, (See e. g. Carothers v. Follette, 314 F.Supp. 1014; Kritsky v. McGinnis, 313 F.Supp. 1247; Nolan v. Scafati, 306 F.Supp. 1; Rodriguez v. McGinnis, 307 F.Supp. 627; Landman v. Royster, 333 F.Supp. 621; Clutchette v. Procunier, 328 F.Supp. 767; Krause v. Schmidt, 341 F.Supp. 1001) and in various Courts of Appeal, including the most recent pronouncements in Adams v. Pate, 445 F.2d 105, (7th Cir., 1971) and Sostre v. McGinnis, 442 F.2d 178, (2d Cir., 1971). In *Sostre*, the District Court held that the inmate should not be punished in such a way as to forfeit earned "good time" credit or to lose the chance to earn such credit by placing him in punitive segregation unless he had written notice of the charges against him, a recorded hearing before a disinterested official with the opportunity to cross-examine adverse witnesses and to call witnesses in his own behalf, the right to retain counsel or counsel substitute, and unless a written decision is rendered. See Sostre v. Rockefeller, 312 F.Supp. 863. The Court of Appeals for the Second Circuit reversed the district court, holding that all of the elements of due process recited by the district court are not necessary to the constitutionality of every proceeding, resulting in serious discipline of a prisoner. I find the rationale and the philosophy of the Court of Appeals for the Second Circuit in *Sostre* compelling. At 442 F.2d page 197, the Court said:

"... we think it inadvisable for a federal court to pass judgment one way or another as to the truly decisive consideration, whether formal due process requirements would be likely to help or to hinder in the state's endeavor to preserve order and discipline in its prisons and to return a rehabilitated individual to society.

It would be too simplistic to dissociate the impact of punishment meted out after a disciplinary hearing from the method by which the hearing itself is conducted."

\* \* \* \* \*

"It would be mere speculation for us to decree that the effect of equipping prisoners with more elaborate constitutional weapons against the administration of discipline by prison authorities would be more soothing to the prison atmosphere and rehabilitative of the prisoner or, on the other hand, more disquieting and destructive of remedial ends. This is a judgment entrusted to state officials, not federal judges."

\* \* \* \* \*

"Neither the Model Penal Code nor the Manual of the American Correctional Association would require confrontation and cross-examination, calling of witnesses by the prisoner, counsel or counsel substitute, or a written statement of evidence and rationale."

\* \* \* \* \*

And at page 198 of 442 F.2d:

"[I]t appears that, among those practices known to us, only in the federal correctional system must a formal proceeding, including each of the elements of the district court's mandate, precede *forfeiture* of good time allowances. Bureau of Prison, Policy Statement: Withholding, Forfeiture, and Restoration of Good Time (No. 7400.6 Dec. 1, 1966). Notably, however, these formalities need not accompany discipline that results in the withholding of good time credit . . . ."

 The relationship of the prison administration or the adjustment committee to the inmates at a disciplinary proceeding should not be considered adversarial in the same sense as a criminal trial. Formal rules of evidence at such a hearing would not be appropriate. Prison officials must have wide access to relevant information in order to dispose of each prisoner's case with due regard for the effect of each decision on the total prison community. The evidence of whether a prison regulation has been violated is likely to be more readily at hand and simpler than evidence bearing on guilt at a criminal trial or bearing on the question of termination of welfare payments. Thus Goldberg v. Kelley, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287, cited by plaintiffs in support of their contention that full procedural due process is required, and which involved the question of termination of welfare payments, is distinguishable from the case before this court.

 The requirements announced in *Sostre* are, in short, that an inmate should be (1) confronted with the accusation, (2) informed of the evidence against him, and (3) afforded a reasonable opportunity to explain his actions. 422 F.2d at page 198. The Court of Appeals for the Seventh Circuit has cited *Sostre* with approval. Adams v. Pate, 445 F.2d 105 (7th Cir., 1971). The prevailing theme of the cases where procedural due process has been considered is that while all procedural safeguards provided citizens charged with a crime cannot and need not be afforded to inmates charged with the violation of prison rules, some assurances of elemental fairness are essential when substantial individual interests are at stake. Nolan v. Scafati, 430 F.2d 548 (1st Cir., 1970).

The procedure for disciplining a prisoner as set forth in the Policy Statement of July 17, 1972, at the Marion Penitentiary meets the requirements of *Nolan* and *Sostre*. There was testimony that these procedures were fully implemented at the institution shortly before the hearing on this motion, including periodic reviews of each inmate in segregation.

 I am not inclined to interfere by injunction with institutional disciplinary procedure in this case where plaintiffs have not made a strong showing of complete lack of due process in the past, of probability of success on the merits, or of irreparable harm. I find that the

basic safeguards against arbitrary and irrational disciplinary actions have been adopted by the defendants. I cannot, therefore, perceive the desirability, necessity, or even the appropriateness of injunctive relief at this point. The question has become moot and will remain so as long as the defendants continue to comply with the procedural due process safeguards set forth in their policy statement.

The Motion for a Preliminary Injunction pertaining to the issue of procedural due process is denied.

## IV. FIRST AMENDMENT ISSUES

### A. FREEDOM OF SPEECH—CENSORSHIP OF MAIL

Plaintiffs complain that the prison authorities are arbitrarily rejecting and returning letters which the inmates in segregation attempt to mail. Four of the inmates who testified at the hearing produced a total of eight letters, which were admitted into evidence, which apparently had been returned by the defendants. The letters are addressed to family members and friends.

Plaintiff Vernon Throgmartin identified four such letters. The first is a brief, one sheet document written in Spanish and addressed to a woman in Mexico. Mr. Throgmartin testified that this addressee spoke no English. Stapled to the envelope is a paper which reads, "Return to inmate. Send in English not Spanish. C. L. Kennedy." The second letter is addressed to a man at a military address. The letter itself is directed to "Lisa," whom Mr. Throgmartin identified as his daughter. The message describes activities at the prison surrounding a work stoppage and the author's appearance before the adjustment committee. The letter contains other descriptions of recent events at the prison and expresses the author's distaste for his treatment, and some general thoughts about prison life. Stapled to the envelope is a paper which reads, "Return to Throgmartin." The third letter is written to Mr. Throgmar-

tin's mother. It decries what the author calls a "reign of terror" at the prison, and describes his own condition. A scrap of paper returned with the letter bears the printing, "Return to inmate confine personal letters to social type correspondence. H–D–18." The fourth letter is addressed to Mr. Throgmartin's other daughter. It too expresses distaste for prison conditions and is dramatically critical of the prison system. It also contains a philosophical soliliquy on life and some personal observations. Stapled to the letter is the handwritten notation. "Return to inmate correspondence authorized only for social purposes."

Plaintiff Dillard Morrison identified two letters. The first is to a woman friend. It expreses disgust at the author's condition in prison, names and accuses his social worker of racism, and discusses the disposition of property owned by Mr. Morrison. Stapled to the letter is the handwritten note, "Return to inmate. Re-submit letter to include only social information. C. L. Kennedy." The second is to the same woman. It refers to actions of a prison "goon squad," complains of lack of medical treatment for Mr. Morrison, and contains general thoughts on prison conditions. A note returned with this letter reads, "Return to inmate. Refers to actions in H–Unit—tell the truth. H–D–13."

Witness Alberto Mares identified a letter he addressed to a woman whom he identified as his attorney. It complained of beatings he had witnessed, referred to letters he had sent to a congressman, and discussed a recently published book. On the envelope is the handwritten statement, "Return start telling the truth."

Witness Kenneth Rogers identified a letter he addressed to his family, in which he complained of his segregation. Stapled to the letter is the handwritten statement, "Tell the truth." The evidence at the hearing was uncontroverted that the letters were returned and the

accompanying notations written by the defendants or their agents.

A substantial quantity of case law has arisen concerning prison inmates' constitutional right to use the mails. Different considerations attend the use of mailings to reach courts, Hatfield v. Bailleaux, 290 F.2d 632 (9th Cir., 1961); religious officials, Cooper v. Pate, 382 F.2d 518 (7th Cir., 1967); and the news media, Nolan v. Fitzpatrick, 451 F.2d 545 (1st Cir., 1971). Before the Court is plaintiffs' claim that, absent a compelling interest of the prison authorities in stopping such letters, the First Amendment gives them a right to correspond with family and friends on subjects embodied in the letters in evidence. The defendants claim that regulation of social correspondence is within their administrative discretion, Wilkerson v. Warden, U. S. Reformatory, 465 F.2d 956 (10th Cir., 1972).

It is generally true, as the Supreme Court recently stated in Cruz v. Beto, 405 U.S. 319 (1972), 92 S.Ct. 1079, 31 L.Ed.2d 263, that ". . . prison officials must be accorded latitude in the administration of prison affairs, . . . prisoners necessarily are subject to appropriate rules and regulations." at 321, 92 S.Ct. at 1081. But the Court also noted, "Federal courts sit not to supervise prisons but to enforce the constitutional rights of all 'persons' which include prisoners." at 321, 92 S. Ct. at 1081.

Certainly the plaintiffs here retain to some degree a First Amendment right to hold and express their feelings and beliefs. One aspect of this right is use of the mails, one of the few realistic means by which an incarcerated person can communicate with the rest of the world. The precise contours of this right can be determined only by considering the legitimate security and rehabilitative interests of the prison administration. Marion Penitentiary Policy Statement MI–7300.2A, which was admitted into evidence at the hearing, lists several bases for the rejection of inmate letters. Those letters which contain threats, blackmail, actual contraband, escape plots, or discussions of criminal activities are subject to rejection under the policy statement. Also forbidden are letters by which the inmate attempts to direct a business outside the prison, or which contain "gossip concerning false, malicious or libelous information about individual inmates with family members of inmates, persons not known prior to commitment, government officials and others." See Policy Statement, page 6. The Court is not here squarely faced with the question of the propriety of any of these categories, but they do serve to illustrate possible compelling justifications for intercepting inmate correspondence. See McCloskey v. Maryland, 337 F.2d 72 (4th Cir., 1964); Sostre v. McGinnis, 442 F.2d 178 (2d Cir., 1971). Likewise, there is no issue here that the inmates have attempted to communicate with a person whom the prison officials believe will deter rehabilitation, see Stroud v. Swope, 187 F.2d 850 (9th Cir., 1951); or that the inmates are violating other regulations concerning use of the mails, see Lee v. Tahash, 352 F.2d 970 (8th Cir., 1965). The issue is whether the letters in question fall outside the inmates' First Amendment right to express and communicate their views. This right is limited by the compelling needs of the prison authorities for security and rehabilitation.

In Carothers v. Follette, 314 F.Supp. 1014 (S.D.N.Y., 1970), the Court found no prison interest sufficient to permit a letter to an inmate's parents to be intercepted. The letter in that case was highly critical of the New York State prison system, and was returned by prison officials because it contained "derogatory and lying statements" about the administration. The Court rejected the prison officials' proferred justification that the letter's comments would retard the plaintiff's rehabilitation, "unless that word is to be defined as abject acceptance of all prison conditions, however unjustifiable," Id. at 1025. The in-

terception was, in the Court's words, "an unjustifiable overreaction," Id. at 1026. In Morales v. Schmidt, 340 F.Supp. 544 (W.D.Wis., 1972), the Court found no justification in the prison's forbidding of an inmate from corresponding with his wife's sister, even though there was evidence that the inmate desired to preserve an illicit relationship with her. In Nolan v. Fitzpatrick, 451 F.2d 545 (1st Cir., 1971), the First Circuit forbade the prison from refusing to mail letters from inmates to news media describing and criticizing conditions in the institution.

 In the case before this court the letters generally describe the conditions at the prison as the inmates see them, express frustration or indignation at the conditions, and contain philosophical observations and often personal thoughts. The letters were returned by the prison authorities and the authors were instructed to confine letters to "social-type" correspondence and to "tell the truth." The Court finds no threats, escape plots, or other unlawful activities discussed in the letters. On their face they do not fall within any of the possible justifications for withholding of inmate mail, see Nolan v. Fitzpatrick, supra. The Court can conceive of no other dangers which their contents could pose to the institution. Indeed, it is difficult to comprehend what information could be more relevant to "social-type" correspondence from a prison inmate than a discussion of how he is being treated and how he feels. It is immaterial that the prison authorities feel that the information contained in the letters is not the truth, see Carothers v. Follette, supra. If the authorities feel that a letter should not go out for legitimate security or rehabilitative reasons, such reasons should be stated on the return and should conform to existing guidelines for mail censorship. But once it is established that the intended recipient of a letter is a proper person to correspond with the inmate, and that the letter's contents do not fall within the possible justifications for censoring, then it follows that it is clearly impermissible for the defendants to withhold such letters merely because they do not like or believe what is stated therein. A central function of the First Amendment is to permit unfettered communication of grievances, real or imagined.

Based on the showing at the hearing, it appears that the plaintiffs have demonstrated a likelihood of success on the merits on their claim of unlawful mail censorship. Continued denial of this First Amendment right is, a fortiori, irreparable injury. Therefore the Court finds that preliminary injunctive relief is appropriate. The Court holds that the eight letters here in evidence, and other similar letters to families and friends not otherwise objectionable, which contain the inmate's depiction of conditions and events in the prison, and his own thoughts about them, may not be rejected for mailing by the defendants or their agents simply for the reason that the defendants do not deem the letters to be truthful.

It is ordered that the defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this order, be and they are hereby preliminarily enjoined from rejecting for mailing letters, not otherwise objectionable, by members of the plaintiff class to family and friends, which contain the inmate's depiction of conditions and events in the prison, and his own thoughts about them, merely for the reason that the defendants do not deem the letters to be truthful.

## B. FREEDOM OF RELIGION

Plaintiffs contend that they are restricted in their First Amendment right of free exercise of religion in that while in segregation they are not permitted group worship, that certain religious dress is not permitted to those of the Jewish faith, and because the prison frequently includes pork in the menu even though the Orthodox Jews are not permitted to eat pork.

The testimony concerning restrictions on free exercise of religion dealt only with those inmates of the Jewish faith. The testimony reveals that Jewish religious services were held for those Jews in general population every other Saturday when a Rabbi came to the prison. Jews in segregation were visited by the Rabbi on those same Saturdays. They were furnished with their Bibles, but apparently were not furnished with skull caps, prayer shawls or daily prayer books in segregation.

■ A prison should not punish a prisoner or discriminate against him because of his religious faith. But as a result of his conviction and sentence to the maximum security Federal penitentiary he has subjected himself to some curtailment of his freedom to exercise his religious beliefs, (Cooper v. Pate, 382 F.2d 518, 7th Cir., 1967), and as a result of violating prison rules an inmate who is thereafter placed in segregation subjects himself to further restrictions, such as the inability to participate in group worship. There was nothing in the testimony to indicate that the prison officials were in any manner attempting to punish or discriminate against any inmate in segregation because of his religious belief. The reason for not permitting substantial paper and reading material into the cells in the segregation unit has already been explained and found to be justifiable under the circumstances. Although it might not be a burden to the prison officers nor a hazard to safety, to furnish one prisoner with the requested garb, this may become overly burdensome and create a safety hazard when multiplied by the many requests that could ultimately follow as a result of judicial interference with normal prison routine. Nor have the plaintiffs made any substantial showing that denial of participation in group worship of those in segregation results in a constitutionally impermissible restriction on the First

Amendment right of freedom of religion.

The testimony with regard to the menu offered inmates of the segregation unit was not exhaustive by either plaintiffs or defendant. Plaintiffs' witness, Kenneth Rogers, testified that his religious beliefs proscribed the consumption of pork, and on many occasions he does not eat anything because pork is included in the meal. There was testimony that plaintiffs are not forced to eat pork and that alternative foods were available from the hot cart brought to the segregation unit which contained the same foods served to the general population. Defendant's Exhibit No. 4, a Policy Statement on religious beliefs and practice of committed offenders, was admitted into evidence. There was testimony that this policy statement is in effect and is being followed at the Marion prison. That policy statement recognizes and permits abstention from eating certain food items as a part of a religious belief and provides that such a person may receive added portions of non-rational food items which do not conflict with the inmate's religious belief.

■ This Court recognizes the practical problems which preparing individualized menus to suit each religious faith might entail. There is no evidence that the prison administration, by its food policy or menu, has or is attempting to discriminate against an inmate because of his religious beliefs. The prison is not required to provide a special diet to a prisoner who is obliged by religious beliefs to abstain from certain food where, as here, it is apparent that a prisoner can obtain a balanced diet by voluntarily avoiding the proscribed foods. Abernathy v. Cunningham, 393 F.2d 775 (4th Cir., 1968).

■■ The First Amendment prohibits the making of a law prohibiting the free exercise of religion. I can find nothing in the record to elevate plain-

tiffs' complaints to the level of a violation of that constitutional right. Certain accouterments and practices customary and normal to certain religious faiths may be affected by the fact that the plaintiffs are inmates of segregation unit of a maximum security penitentiary, but that is not sufficient to require this Court to interfere with the administration of the prison insofar as the practice of religion is concerned. The evidence has not shown and the policy does not constitute an undue restriction on the free exercise of religion at the Marion Penitentiary. Plaintiffs' motion for a preliminary injunction pertaining to the question of exercise of religion is denied.

## CONCLUSION

This Court feels compelled to reiterate the fact that all of plaintiffs complaints arose at the time of and shortly after an unusual and explosive situation at the maximum security institution in the Federal Penitentiary system. This Court will not condone any intentional denial of constitutionally protected rights or freedoms of any persons, be they free or in prison. However, the Court also recognizes the problems inherent in maintaining discipline and security in a maximum security institution such as at Marion. This Court will not judicially interfere with the reasonable standards and policies of the prison to maintain discipline and security. Nor will this Court sit as a constant board of review of prison procedures.

The case was presented to the court first on a Motion for a Temporary Restraining Order and then on a Motion For a Preliminary Injunction. The Court has extensively considered all the testimony, has thoroughly reviewed the evidence, and the "shocking atrocities" alleged to have been committed were nonexistent.

Plaintiffs Motion For a Preliminary Injunction is granted with respect to the censorship of mails, as set forth in the order above; the Motion is in all other respects denied.